EMILIO RIVERA AYALA, peticionario, *v.* CORTE DE DISTRITO DE SAN JUAN, HON. R. CORDOVÉS ARANA, JUEZ, demandada.

Núm. 1532.—*Sometido:* Julio 14, 1943. *Resuelto:* Septiembre 23, 1943.

514

*H. S. McConell* y *R. Díaz Collazo,* abogados del peticionario; *Hon. Procurador General Interino M. Rodríguez Ramos* y *Fernando B. Fornaris, Procurador General Auxiliar,* abogados de la demandada.

El Juez Asociado Señor Todd, Jr., emitió la opinión del tribunal.

El peticionario, por sí y alegando representar a más de mil personas adicionales, todas empleadas del Gobierno de los Estados Unidos de América en Puerto Rico, solicitó de la Corte de Distrito de San Juan expidiera un auto de *injunction* prohibiendo al demandado como Tesorero de Puerto Rico poner en vigor la Ley núm. 29 aprobada el 7 de diciembre de 1942 ((2) pág. 161), que establece el llamado "Impuesto de la Victoria". En la súplica de la petición de injunction se solicitó además, una sentencia declarando (*a*) que dicha ley es nula por haber sido aprobada en contravención del artículo 2 de la Ley Orgánica de Puerto Rico y (*b*) que El Pueblo de Puerto Rico carece de poder para imponer sobre el sueldo pagado por el Gobierno de los Estados Unidos al demandante y demás empleados federales contribución alguna por no haber pedido al Congreso su consentimiento al efecto. La corte inferior declaró con lugar una excepción previa interpuesta por el demandado y desestimó la petición. Por estar envuelta una cuestión de general interés público expedimos un auto de *certiorari* al amparo de la Ley núm. 32 aprobada el 3 de mayo de 1943([1]) para revisar la actuación de la corte inferior.

Antes de entrar a resolver el caso en su fondo es conveniente aclarar que si bien consideramos que la corte infe-

---

[1] "Artículo 1.—Por la presente se adiciona al Código de Enjuiciamiento Civil de Puerto Rico, aprobado en marzo 10 de 1904 (Edición de 1933), e inmediatamente después del artículo 671 del mismo, un artículo que quedará redactado como sigue:

" 'Artículo 671.—A.—No obstante las disposiciones del artículo 670, el Tribunal Supremo de Puerto Rico, en el ejercicio de su discreción, podrá expedir un auto de *certiorari* con el fin de revisar una resolución o sentencia de una corte de distrito cuando la rápida determinación de la cuestión que se presenta para ser revisada redunde en beneficio del interés público. Este método de revisión se aplicará tanto a cuestiones de derecho procesal como a cuestiones de derecho sustantivo. El auto podrá expedirse prescindiendo del hecho de que la resolución o sentencia de que se trate sea revisable mediante apelación ordinaria ante el Tribunal Supremo, y podrá expedirse en cualquier etapa del procedimiento, tanto antes como después de dictarse sentencia final por la corte de distrito.' " (Leyes de 1943 ((1) pág. 85).

rior no erró al resolver que el peticionario tenía a su alcance un remedio adecuado en ley—pagar bajo protesta y acudir al Tribunal de Contribuciones—que hacía improcedente la concesión del injunction solicitado, esto no obstante, como tanto en la vista oral como en su alegato escrito el demandado renunció a toda cuestión técnica dada la conveniencia de que las cuestiones constitucionales planteadas fueran resueltas en su fondo por esta Corte, somos de opinión que la rápida determinación de las cuestiones planteadas redundará en beneficio del interés público, lo que justifica que procedamos a resolverlas al amparo del artículo 671A citado al margen, supra.

◼ Se queja el peticionario de que la corte inferior no dictara la ·sentencia declaratoria solicitada y se limitara a desestimar la demanda de injunction. Si bien es cierto que la corte sentenciadora no hizo un pronunciamiento expreso en su sentencia en cuanto al remedio declaratorio solicitado, no lo es menos que en el curso de la opinión que dictó para sostener la misma, entró a considerar y resolver por lo menos una de las cuestiones constitucionales planteadas. Al desestimar la demanda la corte inferior de hecho declaró que la ley atacada es válida. En situación similar la Corte Suprema de los Estados Unidos en el reciente caso de *Great Lakes Dredge & Dock Company* v. *Hoffman,* 318 U. S. ____ (24 de mayo de 1943) resolvió que: "La sentencia ordenó la desestimación del pleito, pero debe interpretarse a la luz de la opinión de la corte y sus conclusiones de hecho y de derecho. (Citas.) Así interpretada se basa enteramente en la declaración de la corte que el estatuto aplicado a los peticionarios es constitucional; es por tanto en efecto una sentencia declaratoria.

◼ La primera cuestión planteada por el peticionario es que los sueldos que perciben los empleados del Gobierno Federal no están sujetos al pago del impuesto de la Victoria que provee el artículo 1 de la Ley núm. 29 del 7 de diciembre

de 1942,([2]) porque el Congreso no le ha concedido tal facultad al Gobierno Insular, y arguye que ni la decisión en el caso de *Graves* v. *N. Y. ex rel. O'Keefe,* 306 U. S. 466 (1939), ni la sección 4 del "Public Salary Tax Act", de 1939,([3]) amplían en forma alguna dicha facultad, debiendo regirse el presente caso por lo resuelto en el de *Domenech* v. *National City Bank,* 294 U. S. 199 (1935). No tiene razón el peticionario.

El caso de *Domenech,* supra, no hizo otra cosa que aplicar la bien conocida regla establecida en *McCulloch* v. *Maryland,*

---

[2] "Artículo 1.—Por la presente y hasta seis (6) meses después del cese de las hostilidades entre Estados Unidos de América y Alemania, Italia y Japón se impone y se cobrará y pagará en adición a cualquiera otra contribución impuesta por la Ley de Contribución sobre Ingresos de 1924, una contribución de cinco (5) por ciento sobre el ingreso bruto de todo individuo, en exceso de quince dólares cinco centavos ($15.05) semanales, por concepto de intereses, rentas, sueldos, salarios, jornales, honorarios, donaciones, compensaciones, remuneraciones, comisiones, premios, emolumentos, dividendos, beneficios en sociedades civiles o mercantiles, anualidades o cualesquiera otros ingresos determinables, que no provengan de operaciones por medio de contratos de compraventa, en los que, quien los recibe, hubiese actuado como contratante. Sin que esto pueda interpretarse como una limitación del término 'sueldos', el mismo se refiere también a toda clase de sueldos pagados en Puerto Rico por el Gobierno de los Estados Unidos de América. En el caso de rentas, se deducirá también como exención cualquier cantidad efectivamente pagada en concepto de intereses por gravámenes sobre la propiedad que produzca la renta. De los ingresos tributables por esta Ley se deducirá también la suma recibida por concepto de compensaciones por accidentes del trabajo. Se entenderá por ingreso toda cantidad de dinero realmente recibida por el contribuyente o depositada o consignada a su favor o para su beneficio. Ese mismo significado tendrá la palabra pago, según usada en esta Ley.

"La contribución impuesta por esta Ley se cobrará y pagará a partir de enero 1 de 1943.

"Esta contribución adicional sobre ingresos se conocerá como 'El Impuesto de la Victoria.' Así podrá ser citada y así será citada en el cuerpo de esta Ley."

[3] "Sec. 4.—Por la presente los Estados Unidos consienten a que se impongan contribuciones a la compensación, recibida después del 31 de diciembre de 1938, por servicio personal como funcionario o empleado de los Estados Unidos, cualquier territorio o posesión o subdivisión política del mismo, el Distrito de Columbia, o cualquier agencia o instrumentalidad de cualquiera o más de los anteriores, por una autoridad contributiva debidamente constituída que tenga jurisdicción para imponer contribuciones sobre tal compensación, si la misma no discrimina en contra de tal funcionario o empleado por razón de la fuente de tal compensación."

4 Wheat. 316 (1819), de que tanto el Gobierno Federal como sus agencias e instrumentalidades están exentos de toda clase de tributación estatal, y resolver que:

"Puerto Rico, una posesión insular, al igual que un territorio, es una agencia del Gobierno Federal, carente de una soberanía independiente comparable con la de un estado en virtud de la cual pueda imponer contribuciones. La autoridad para imponer contribuciones debe ser derivada de los Estados Unidos. Pero al igual que un estado, aunque por una razón distinta, tal agencia no puede imponer una contribución a una instrumentalidad federal. Un estado, aunque soberano, está impedido de así hacerlo porque la Constitución requiere que no haya intervención por parte de un estado con los poderes conferidos al Gobierno Federal. Un territorio o posesión no lo puede hacer porque una dependencia no puede imponerle una contribución a su soberano. Cierto es que el Congreso puede consentir a la imposición de una contribución, pero la concesión a la Isla de un poder general para imponer contribuciones no debe ser interpretada como un consentimiento. El privilegio únicamente podrá ser conferido por una ley del Congreso en que de manera clara y expresa así se haga constar."

La doctrina del caso de *Domenech,* supra, que es la misma del caso de *McCulloch,* supra, ratificada en innumerables casos posteriores por el Supremo nacional, está en vigor y no ha sido variada. Lo que sí se ha aclarado y limitado es el concepto de instrumentalidad o agencia del Gobierno Federal a que debe aplicarse dicha doctrina, habiéndose descartado la aplicación que de la misma se hizo a los sueldos de funcionarios y empleados desde que se resolvió el caso de *The Collector* v. *Day,* 11 Wall. 113 (1870). En este caso se sostuvo que era nula una contribución federal sobre ingresos impuesta al sueldo de un juez de un estado, iniciándose así la que podríamos llamar doctrina de la inmunidad recíproca entre el Gobierno Federal y el de los estados en cuanto a la imposición ilimitada de contribuciones que podría obstaculizar, bajo ciertas circunstancias, el funcionamiento de dichos gobiernos e imponer una carga indebida a los mismos. En *N. Y. ex rel. Rogers* v. *Graves,* 299 U. S. 401, se aplicó

esa regla anulándose una contribución sobre ingresos del estado de Nueva York impuesta al abogado de la Panama Rail Road Company por ser esta compañía una agencia del Gobierno Federal, y en *Brush* v. *Commissioner,* 300 U. S. 352, aplicando la doctrina de reciprocidad a la inversa, se resolvió que el tributo federal sobre ingresos no podía aplicarse al sueldo de un ingeniero del sistema de acueducto de la ciudad de Nueva York. En una u otra forma la doctrina se aplicó en otros casos, pero aun desde su enunciación en *The Collector* v. *Day,* supra, fué objeto de un fuerte disenso del Juez Asociado Sr. Bradley, quien hizo constar que la misma estaba "fundada en una falacia, que conducirá a consecuencias perjudiciales." A través de los años otros jueces expresaron su desaprobación a la doctrina(4) con frases no menos mordaces, contándose entre ellas la ya famosa paráfrasis al *dictum* del Juez Marshall en *McCulloch* v. *Maryland,* supra, al efecto de que "el poder de imponer contribuciones envuelve el poder de destruir," a lo que comentó el Juez Holmes en *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, que "El poder de imponer contribuciones *no* envuelve el poder de destruir *mientras esta corte exista."* (Bastardillas nuestras.)

El primer caso en que se descartó parcialmente la regla de inmunidad recíproca contributiva en relación con sueldos de funcionarios o empleados del Gobierno Federal o estatal o de alguna de sus agencias o instrumentalidades fué el de *Helvering* v. *Gerhardt,* 304 U. S. 405 (1938). El caso envolvía la aplicación de la contribución federal sobre ingresos a los sueldos de unos empleados de la Autoridad del Puerto de Nueva York, una agencia o instrumentalidad del estado de Nueva York. Después de revisar la jurisprudencia anterior el Tribunal, por voz del Juez Asociado Sr. Stone, hizo constar el hecho de que "la inmunidad estatal del poder contributivo nacional, reconocido en *The Collector* v. *Day,* supra, estaba estrechamente limitada a un funcionario judicial del

---

4 Véase el resumen que hace el Juez Frankfurter en su opinión concurrente en *Graves* v. *N. Y. ex rel. O'Keefe,* supra.

estado que ejerce funciones que competían a los gobiernos estatales en el momento en que la Constitución fué aprobada, y sin el cual poder ningún estado 'podrá por mucho tiempo continuar existiendo,' '' y negándose a ampliar dicha limitación declaró válida la contribución impuesta.

En una opinión concurrente en este caso el Juez Asociado Sr. Black hizo constar que el tribunal debió ''revisar y reexaminar la regla basada en *Collector* v. *Day*,'' y que ''toda la doctrina de inmunidad contributiva intergubernamental debe ser revisada a la luz del efecto de la Enmienda Décimosexta que autoriza al Congreso a imponer contribuciones sobre ingresos 'que se deriven de cualquier origen.' ''

La revisión solicitada por el Juez Black no se hizo esperar, pues dos años después, en el caso de *Graves* v. *N. Y. ex rel. O'Keefe,* 306 U. S. 466, el Tribunal Supremo revocó expresamente los de *The Collector* v. *Day,* supra, y *N. Y. ex rel. Rogers* v. *Graves,* 299 U. S. 401, en cuanto al extremo de que los sueldos de los empleados y funcionarios del gobierno nacional o estatal, o de sus agencias e instrumentalidades, gozaban de inmunidad en cuanto a la imposición de una contribución sobre ingresos. Una vez más, por voz del Juez Asociado Sr. Stone, la corte se expresó, a las páginas 480 y 481, en esta forma:

''La presente es una contribución sobre ingreso no discriminatoria, aplicada a salarios en gradación específica. No es, en forma o fondo, una contribución impuesta a la Home Owners' Loan Corporation o a su propiedad o ingreso, ni es pagada por la corporación o el gobierno de sus fondos. La misma se calcula de acuerdo con el ingreso recibido por el contribuyente como compensación por sus servicios, el cual una vez recibido por éste se convierte en propiedad suya, siendo así la contribución impuesta sobre el privilegio de recibirlo, pagada de sus propios fondos y no directa ni indirectamente de los fondos del gobierno. La teoría que en cierta época tuvo aprobación condicional de que una contribución sobre ingreso es, legal o económicamente, una contribución sobre su origen, no es por más tiempo sostenible, *New York ex rel. Cohn* v. *Graves,* 300 U. S. 308, 313, 314; *Hale* v. *State Board,* 302 U. S. 95, 108; *Helvering* v.

*Gerhardt,* supra; *cf. Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514; *Fox Film Corp.* v. *Doyal,* 286 U. S. 123; *James* v. *Dravo Contracting Co.,* supra, 149; *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376, y la única base posible para poder atribuir inmunidad constitucional al salario de un empleado del gobierno nacional o agencia gubernamental, contra la contribución sobre ingreso impuesta por un estado, es que la carga económica de la contribución es traspasada en alguna forma de manera que constituye una carga al gobierno nacional equivalente a una obstaculización de un gobierno por el otro en el desempeño de sus funciones.''

Y más adelante dijo la corte, a la página 486:

''Asumiendo, como lo hacemos, que la Home Owners' Loan Corporation está investida de la misma inmunidad contra la imposición de .contribuciones por los estados que el gobierno en sí, no podemos decir que la presente contribución sobre el ingreso de sus empleados le impone a ésta una carga inconstitucional. Todas las razones expuestas en extenso en el caso de *Gerhardt,* para rehusar atribuir una prohibición constitucional a la imposición de una contribución federal sobre ingresos a los salarios de empleados estatales, son de igual fuerza cuando se reclama inmunidad a la imposición de una contribución estatal sobre ingresos sobre salarios pagados por el gobierno nacional o sus agencias. En este respecto no encontramos base para establecer una diferencia en el resultado tanto si el ingreso tributado es el salario o alguna otra forma de compensación, como si el contribuyente es un empleado o funcionario tanto de un estado como del gobierno nacional, o sus agencias. En ningún caso hay base para asumir que se está imponiendo al gobierno en cuestión una carga económica tan tangible o cierta que justifique que la corte declare que el contribuyente está investido con la tácita inmunidad constitucional del gobierno que le emplea contra la imposición de contribuciones.''

Consecuencia lógica de la nueva doctrina establecida en el caso de *Graves* v. *N. Y. ex rel. O'Keefe,* supra, fué la posterior revocación en *Alabama* v. *King & Boozer,* 314 U. S. 1 (1941), de los casos de *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, y *Graves* v. *Texas Company,* 298 U. S. 393, sosteniéndose que no existía inmunidad contributiva en relación con una contribución sobre ventas impuesta por un estado a la compra de materiales de construcción por una persona que

tenía un contrato a base de *cost plus a fixed fee* con el Go-
bierno Federal para construir un campamento del ejército.
Al mismo efecto véase *Curry* v. *United States,* 314 U. S. 14.
Sin embargo, en *Fed. Land Bank* v. *Bismarck Co.,* 314 U. S.
95, se sostuvo que no podía cobrarse a un banco federal el
importe de una contribución estatal sobre ventas de ciertos
materiales de construcción debido a que el Congreso podía
eximir de tributos estatales a dichas instituciones. Se aplicó
por tanto la misma regla que funcionó en *Domenech* v.
*National City Bank,* supra. Otras aplicaciones y limitaciones
sobre el alcance de la misma regla establecida en *Graves* v.
*N. Y. ex rel. O'Keefe,* supra, pueden verse en *Penn Dairies*
v. *Milk Control Comm'n.,* 318 U. S. 261 (1943), y *Mayo et al.*
v. *United States,* ____ U. S. ____, resuelto en 1 de junio de
1943.

Tenemos, por lo tanto, que el campo ha quedado debida-
mente deslindado. Tanto el estado como el territorio o la
posesión insular carecen de facultad para imponer una con-
tribución a una agencia o instrumentalidad del Gobierno
Federal. Empero, los sueldos de empleados federales o los
de aquellos que trabajan en una agencia o instrumentalidad
federal no están exentos de tributación bajo una ley de
ingresos.

Arguye el peticionario, sin embargo, que la doctrina
del caso de *Graves* v. *N. Y. ex rel. O'Keefe,* supra, es apli-
cable únicamente a los estados en sus relaciones interguber-
namentales con el gobierno federal pero no a Puerto Rico, a
quien el Congreso no le ha reconocido el poder de imponer
dicha contribución. El caso de *Domenech* v. *National City
Bank,* supra, en que se ampara, no es autoridad, después de
lo resuelto en el de *Graves,* supra, para sostener una regla
distinta, especialmente después de la aprobación del Public
Salary Tax Act, cuya sección cuarta hemos transcrito ante-
riormente. La contención del peticionario es que dicha sec-
ción no confirió a Puerto Rico el poder de imponer contri-
buciones a los sueldos de empleados federales debido a la

limitación que contiene de que el mismo se otorgó únicamente a "una autoridad contributiva debidamente constituída *que tenga jurisdicción para imponer contribuciones sobre tal compensación*" (bastardillas nuestras), es decir que el estatuto no confirió jurisdicción para imponer la contribución si la jurisdicción no existía previamente.

En primer término diremos que si el razonamiento del peticionario pretende tener el alcance de sostener que nuestra Legislatura no es una autoridad contributiva debidamente constituída, no puede ni debe prevalecer. Sostener que Puerto Rico no es "una autoridad contributiva debidamente constituída" después de estarse rigiendo veintiséis años por la Carta Orgánica aprobada en 1917, es ignorar, no sólo el alcance que la jurisprudencia de nuestro más alto tribunal nacional ha reconocido a la forma de gobierno establecida en Puerto Rico por el Congreso a virtud de dicha Carta constitucional, sino menospreciar las disposiciones expresas, de la misma. El caso de *Domenech* v. *Havemeyer,* 49 F. (2d) 849 (1931), reconoció la autoridad de nuestra Legislatura para aprobar una ley de contribuciones sobre ingresos, aún con anterioridad a la enmienda al artículo 3 de nuestra Carta Orgánica en 1927 en que expresamente se le concedió poder para imponer tales contribuciones, al expresarse la Corte de Circuito de Apelaciones en esta forma:

"Es cierto que dicha Legislatura [de Puerto Rico] no tiene poderes excepto aquéllos expresamente concedidos, o por necesaria implicación, por el Congreso. *Benedicto, Treasurer* v. *Porto Rican Am. Tobacco Co.,* (C.C.A.) 256 F. 422, 425.

"Pero por la sección 37 de la Carta Orgánica de marzo 2, 1917 (39 Stat. 964 [48 U.S.C.A. §§774, 821]), a la Legislatura de Puerto Rico se le concedieron poderes generales legislativos y por la sección 3 (39 Stat. 953 [48 U.S.C.A. §741]) se le concedió poder para imponer 'contribuciones e impuestos sobre la propiedad, rentas internas y derechos sobre licencias y por franquicias, privilegios y concesiones.'

"La Enmienda Décimosexta había sido aprobada; hay gran peso en la contención de que 'rentas internas', según usada en esta ley, incluye contribuciones sobre ingresos, sin distinción, en Puerto Rico, al igual que en los Estados Unidos. (Citas)."

Y más adelante, al comentar el poder concedido a la Legislatura de Puerto Rico para "enmendar, alterar, modificar o derogar" la ley federal sobre contribuciones de ingresos, sostuvo que "Obviamente hay muy poca diferencia entre el poder (mencionado) y el poder para aprobar una ley similar *de novo.*" "Que el Congreso tuvo la intención de que la Legislatura de Puerto Rico tuviera poder para aprobar leyes sobre ingresos está demostrado expresamente por la Ley de mayo 4, 1927 ·(44 Stat. 1418). Esto puede razonablemente interpretarse como que tuvo la intención de hacer absolutamente claro lo que anteriormente existía implícitamente." Es más, la propia Corte Suprema de los Estados Unidos al resolver posteriormente el tantas veces citado caso de *Domenech* v. *National City Bank,* supra, hizo la siguiente referencia en una anotación a la página 206: "Para una discusión de la *autoridad implícita* de la Isla para imponer una contribución sobre ingresos antes de la aprobación de la Ley de marzo 4 de 1927, véase *Domenech* v. *Havemayer,* 49 F. (2d) 849, 850," de la cual acabamos de citar en parte.

Menos explícita que la autoridad concedida a la Legislatura de Puerto Rico en relación con el poder para imponer contribuciones, de acuerdo con la sección 3 de la Carta Orgánica, es la contenida en la sección 55 de la Ley Orgánica de Hawaii (48 U.S.C.A., Sec. 562) que dice: "El poder legislativo del Territorio se extenderá a todas las materias propias de legislación no inconsistentes con la Constitución y·las leyes de los Estados Unidos localmente aplicables." Al resolver un caso similar al de autos, *Yerian* v. *Territory of Hawaii,* 130 F. (2d) 786 (1942), la Corte de Circuito para el Noveno Circuito ·bajo la autoridad del caso de *Graves* v. *O'Keefe,* supra, declaró válida una contribución impuesta por el Territorio a un empleado de la Home Owners' Loan Corporation, una instrumentalidad de los Estados Unidos. La contención del apelante fué la misma que aquí sustenta el peticionario, es decir, que el Congreso no había concedido poder a la Legislatura territorial para imponer tal contribución. Después de

citar la sección 55 del Acta Orgánica, supra, y de referirse a la regla de que ni los Estados, ni los Territorios y posesiones, pueden imponer contribuciones a una instrumentalidad de los Estados Unidos, citando entre otros el caso de *Domenech* v. *National City Bank,* supra, la Corte se expresó así a la página 789:

"En el caso ante nos, sin embargo, no se trata de una contribución impuesta a una agencia (*instrumentality*) de los Estados Unidos. La Ley de Bienestar ('Hawaii Unemployment Relief and Welfare Act') no impone tal contribución; sí impone una contribución a la compensación recibida por los empleados de las agencias de los Estados Unidos. Esta contribución sólo nos interesa en tanto en cuanto es de aplicación a la compensación recibida por los empleados de la 'Home Owners' Loan Corporation'. El Congreso no ha exentado del pago de contribución tal compensación. *Graves* v. *People of New York ex rel. O'Keefe,* 306 U.S. 466, 59 S. Ct. 595, 83 L. Ed. 927, 120 A. L. R. 1466. Así a tal compensación podría imponérsele contribución, aun cuando el Congreso no hubiese dado su consentimiento a tal efecto. *Graves* v. *People of New York ex rel. O'Keefe,* supra. Véase, además, *State Tax Commission* v. *Van Cott,* 306 U. S. 511, 59 S. Ct. 605, 83 L. ed. 950. En realidad, sin embargo, el Congreso dió tal consentimiento por medio de la sección 4 de la 'Public Salary Tax Act' de 1939, 5 U.S.C.A. §84a, que provee: (Se cita.)

"La contribución aquí envuelta se impuso sobre la compensación recibida por el apelante, después del 31 de diciembre de 1938, por servicios personales prestados como empleado de una agencia de los Estados Unidos. La misma fué impuesta por una autoridad debidamente constituída (la Legislatura Territorial) con jurisdicción para tributar tal compensación y no establece discrimen alguno contra el apelante por razón de la procedencia de tal compensación. Es nuestra conclusión que la contribución fué impuesta con el consentimiento del Congreso."

Si todo lo anteriormente expuesto no fuera suficiente para sostener la autoridad de nuestra Legislatura, no podemos ni debemos nunca olvidar al plantear cuestiones que tienden a menoscabar los poderes concedidos y aun aquellos implícitamente inherentes a la estructura del gobierno de que disfrutamos, lo expresamente resuelto por el Tribunal Supremo de

los Estados Unidos en el caso de *Puerto Rico* v. *Shell Co.,* 302 U. S. 253 (1937) al efecto de que: "El propósito del Acta Foraker y del Acta Orgánica (de 1917) *fué conceder a Puerto Rico completo poder de propia determinación local, con una autonomía similar a la de los Estados y Territorios incorporados.* (Citas.) *El efecto fué conferir al territorio muchos de los atributos de la cuasi-soberanía poseída por los Estados* —como por ejemplo inmunidad a ser demandado sin su consentimiento. (Cita.) *Por dichas leyes, la estructura típica gubernamental americana, consistente de los tres departamentos independientes—legislativo, ejecutivo y judicial—fué erigida.* '*Un cuerpo político*—un commonwealth—*fué creado.* 31 Stat. 79 §7 c 191. *El poder de imponer·contribuciones,* el poder de aprobar y poner en vigor leyes y otros poderes propiamente gubernamentales fueron conferidos. Y en tanto en cuanto a cuestiones locales se refiere, como ya hemos demostrado en cuanto a los territorios continentales, *poderes legislativos fueron conferidos casi, si no tan, extensos como los ejercitados por las legislaturas estatales.*" (Bastardillas nuestras.)

Véase, además, *West India Oil Co.* v. *Domenech,* 311 U. S. 20.

Ahora bien, si el razonamiento del peticionario se limita a sostener que aun reconociendo la existencia de la autoridad contributiva debidamente constituída en Puerto Rico, ésta no tenía jurisdicción antes de aprobarse el Public Salary Tax Act y que, por tanto, carece ahora de dicha jurisdicción, tampoco podemos estar conformes. El argumento del peticionario aparentemente es al efecto de que cuando el Congreso en el año 1927 concedió poder a Puerto Rico para imponer contribuciones sobre ingresos lo hizo cuando la jurisprudencia entonces sostenía que no podía imponerlas a los sueldos de funcionarios federales y que, por lo tanto, cuando el Congreso aprobó el Public Salary Tax Act en el año 1939, la Legislatura de Puerto Rico no tenía jurisdicción para imponerles tal contribución.

Como hemos visto, en el caso de *Domenech* v. *National City Bank,* supra, la Corte Suprema Nacional reconoció la autoridad implícita de Puerto Rico para imponer contribuciones sobre ingresos aun antes del año 1927 en que concedió expresamente tal poder, y al hacerlo concedió jurisdicción para imponer toda clase de contribuciones sobre ingresos que constitucionalmente podía imponerse originalmente. El hecho de que la Corte Suprema primero resolviera que a los sueldos de los funcionarios federales no podía imponérseles tal contribución, y más tarde resolviera lo contrario, no implica que la autoridad y jurisdicción concedida haya variado. El estatuto es el mismo. Lo único que varió en el transcurso de los años fué su interpretación. La restricción que la Corte Suprema había impuesto fué eliminada por la propia Corte Suprema. De manera que la jurisdicción de la autoridad legislativa de Puerto Rico siempre existió.

No será ciertamente este Tribunal Supremo quien por intepretaciones restrictivas e injustificadas tienda a menoscabar y limitar los poderes concedidos a nuestra Legislatura siempre que al ejercitarlos se mantenga dentro de las limitaciones que nuestra Carta Orgánica le ha señalado. Resolvemos que la Legislatura de Puerto Rico es una autoridad contributiva debidamente constituída que tenía y tiene jurisdicción para imponer contribuciones dentro del alcance del Public Salary Tax Act, supra, y que los sueldos de los empleados federales en Puerto Rico están sujetos al pago del Impuesto de la Victoria si, como pasamos a considerar y resolver, dicho impuesto no es discriminatorio, segunda cuestión planteada en este caso.

██ Sostiene el peticionario que el Impuesto de la Victoria es nulo porque la ley establece un discrimen en contra de las personas que derivan su ingreso en concepto de sueldos, salarios o jornales y a favor de personas que derivan ingresos de contratos de compraventa, tales como corredores de bolsa, especuladores de bienes raíces y otros similares y que la exención o clasificación contenida en el artículo 1 de la ley,

supra nota 2, es tan amplia que incluye los ingresos de todos los comerciantes, agricultores, intermediarios, mayoristas y detallistas. Arguye, por último, que las clases beneficiadas por la exención son tan variadas que no puede determinarse la base racional de la clasificación.

El exagerado argumento del peticionario tiene como base el hecho de que no toma en consideración en forma alguna la frase limitativa de la exención que contiene el estatuto, es decir, están exentos los ingresos que "provengan de operaciones por medio de contratos de compraventa, en los que, quien los recibe, *hubiese actuado como contratante.*" (Bastardillas nuestras.) La limitación es expresa y no puede sostenerse, como pretende el peticionario, que la intención legislativa fué eximir del pago del impuesto a todos los que actúen meramente como intermediarios o en otra forma que no sea las de contratantes, y perciban una comisión como compensación de sus servicios.

La única cuestión a resolver es si la exención o clasificación mencionada viola el artículo 2, sección 1, del Acta Orgánica que provee que "No se pondrá en vigor en Puerto Rico ninguna ley que privare a una persona de...propiedad sin el debido procedimiento de ley, o que negare a una persona de dicha Isla la protección igual de las leyes".

Esta cláusula contiene prácticamente la misma fraseología que la Enmienda Catorce de la Constitución de los Estados Unidos e interpretándola, en relación con la misma cuestión que ahora discutimos, la Corte de Circuito de Boston en el caso de *San Juan Trading Co.* v. *Sancho, Tesorero,* 114 F. (2d) 969, 971, ha dicho que "Esta cláusula, como la Enmienda Catorce a la Constitución de los Estados Unidos, en ninguna forma limita el poder de la Legislatura de Puerto Rico para clasificar los objetos de legislación o las personas afectadas por ella en tal forma que sujete a diferentes clases a diferentes tipos de contribuciones. (Citas.) Empero, tal clasificación tiene que estar razonablemente relacionada con el objeto de la legislación y debe estar basada en alguna distin-

ción que pueda racional e imparcialmente constituir la razón para la diferencia en la contribución.''

Esta doctrina ha sido aplicada por esta Corte en distintos casos, *Pueblo* v. *Avilés,* 54 D.P.R. 272, 281; *M. J. y S. Cabrero, Sucrs.* v. *Sancho Bonet, Tesorero,* 58 D.P.R. 531; *Ballester* v. *Tribunal de Apelación,* 61 D.P.R. 474. Al igual que otras reglas de interpretación constitucional, ésta ha sido una de las más debatidas en su alcance y aplicación por la Corte Suprema Nacional desde su enunciación, en forma definitiva, también por voz del Juez Asociado Sr. Bradley, en el caso de *Bell's Gap. R. Co.* v. *Pennsylvania,* 134 U. S. 232 (1890). Como señala John B. Sholley en su tesis doctoral ''La Igual Protección en la Legislación Contributiva'', 24 Virginia Law Review, 229 y 388 (1938), publicada también en 1 Selected Essays on Constitutional Law, Libro 5, Taxation, 39–91 (1938), esta opinión fué el punto de partida en el desarrollo de la cláusula sobre igual protección como una limitación al poder contributivo de los Estados y aun cuando admite que lo dicho por el Juez Bradley fué un *dictum*—pues la contribución envuelta en dicho caso fué sostenida—afirma que la Corte Suprema nunca se ha apartado de la posición en ella expuesta y que ''casi en igual grado que las opiniones más famosas del Juez Presidente Marshall, se ha considerado como la interpretación autorizada de la Constitución sobre la materia''. A trueque de hacer un poco más extensa de lo necesario esta opinión parécenos apropiado citar aquí las palabras del Juez Bradley. Dicen así:

''La disposición de la Enmienda Décimocuarta de que ningún Estado negará a persona alguna, dentro de su jurisdicción, la igual protección de las leyes, no tiene el propósito de impedir que un Estado reajuste su sistema contributivo de manera adecuada y razonable. Si así lo desea, podrá eximir de toda clase de contribución ciertos bienes, tales como iglesias, bibliotecas y las propiedades pertenecientes a instituciones caritativas. Podrá imponer diferentes contribuciones específicas sobre distintas ocupaciones y profesiones, pudiendo, además, variar los tipos de arbitrios sobre distintos productos; podrá imponer contribuciones de distinta manera a los bienes muebles e

inmuebles; podrá imponer contribuciones solamente a bienes tangibles y no a garantías de pago; podrá, a su discreción, permitir deducciones por causa de deudas. Toda esa reglamentación y cualquiera otra de carácter similar, siempre y cuando la misma se desarrolle dentro de límites razonables y de uso corriente, están dentro de la discreción de la Legislatura Estatal, o bien de la población del Estado al estructurar su Constitución. Pero los discrímenes claros y hostiles contra clases y personas particulares, especialmente aquellos de carácter poco común, desconocidos a las prácticas de nuestros gobiernos, pudieran contravenir la prohibición constitucional. Sería, sin embargo, poco práctico y poco sabio tratar de formular una regla o definición general sobre la materia, que abarcase todos los casos. Éstos tienen que decidirse a medida que surjan. Creemos poder asegurar que no fué la intención de la Enmienda Décimocuarta obligar al Estado a adoptar una regla inflexible de tributación uniforme. De ser esa la interpretación adecuada, no solamente suplantaría todos aquellos preceptos constitucionales y leyes de algunos Estados, cuyo fin es asegurar la uniformidad de la tributación, y las cuales van comúnmente acompañadas de cualificaciones consideradas como esenciales, sino que anularía el efecto de aquellos discrímenes, requeridos por el interés social, que son necesarios para el fomento de industrias útiles y necesarias, así como para evitar la intemperancia y el vicio, las cuales cada estado, en una forma u otra, crea conveniente adoptar.''

Desde luego, el poder legislativo de hacer clasificaciones o conceder exenciones en materia contributiva no es absoluto pero, en tanto en cuanto no sean arbitrarias o afecten en forma discriminatoria a los contribuyentes incluídos en la clasificación o exención, debe sostenerse la actuación legislativa. En todo caso, corresponde al que ataca la validez de la ley ''demostrar que no descansa sobre una base razonable y que es esencialmente arbitraria'', pues ''cuando se impugna la clasificación, si puede concebirse cualquier estado de hechos que la justifique, se presumirá que tal estado de hechos existió en la fecha de la aprobación de la ley.'' *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61 (1910).

El fin que se persigue por medio de la clasificación en las leyes contributivas es establecer un sistema de acuerdo con las condiciones y necesidades locales, a virtud del cual se

distribuya la carga contributiva equitativamente y, para realizar esto es obvio que corresponde conceder y reconocer a la rama legislativa del gobierno la más amplia libertad de acción. *Citizens' Telephone Co.* v. *Fuller,* 229 U. S. 322. "Porque los miembros de la legislatura necesariamente disfrutan de una familiaridad en cuanto a las condiciones locales...la presunción de constitucionalidad sólo puede desvirtuarse con la más explícita demostración de que una clasificación es un discrimen hostil y opresivo en contra de ciertas personas o clases." *Madden* v. *Kentucky,* 309 U. S. 83, 88 (1939). En este caso se sostuvo la validez de un estatuto que imponía una contribución de cincuenta centavos por cada cien dólares que estuvieran depositados en bancos fuera del Estado y solamente una de diez centavos a los depósitos en bancos locales.

Fué a virtud de la decisión en el caso de *Madden,* supra, que el Supremo Nacional revocó su decisión en *Colgate* v. *Harvey,* 296 U. S. 404 (1935) en la que se había anulado una exención concedida por la ley "al interés recibido por dinero prestado dentro del Estado, a un tipo que no exceda del 5 por ciento al año". La opinión disidente del Juez Stone, con la cual concurrieron los Jueces Brandeis y Cardozo, contiene una de las más hábiles y profundas discusiones sobre la materia. Como hoy, a virtud del caso de *Madden,* supra, es la opinión de Stone la que prevalece, de ella citamos los siguientes párrafos:

"La cláusula sobre igual protección no prohibe inigualdades en la imposición de contribuciones por los Estados. Un Estado puede seleccionar los objetos . . . y seleccionar, que es sólo el converso de exención, envuelve la imposición de una carga contributiva sobre algunos que no es impuesta a otros. Como esta Corte ha resuelto repetidamente, *las inigualdades resultantes del hecho de que se seleccione una clase en particular para imponerle contribución o para exentarla, no importa la razón para la selección, y aun si no hay una razón discernible, no deben declararse nulas cuando no tienen ningún otro indicio claro de que el propósito o efecto es un discrimen hostil y opresivo en contra de ciertas personas o clases* (véase cómo

las palabras de la mayoría en el caso de *Madden,* supra, están tomadas al final textualmente de la opinión disidente de Stone en el de *Colgate,* supra.).

"El fin perseguido por la clasificación tiene importancia al resolver la constitucionalidad de la contribución solamente en cuanto sirva para demostrar que el discrimen no es denigrante (invidious). *Si aparece o puede razonablemente asumirse que es con el propósito de promover un fin público permisible, no puede ser condenada porque una clase deba pagar una contribución que otra no paga.*

"Al tirar la línea entre lo tributable y lo exentado, la cláusula sobre igual protección no requiere lo imposible o lo impráctico. A menos que la línea que el Estado tire caiga tan fuera de lugar que palpablemente no tenga relación razonable alguna con el fin legítimo perseguido, no corresponde al poder judicial el rechazarla y decir que otra debe ser sustituída."

La misma pauta trazada a las legislaturas estatales es aplicable a la Legislatura de Puerto Rico y así vemos que solamente en casos extremos y cuando se hace una clasificación claramente irrazonable y arbitraria—como en el caso de los fósforos cuadrados o redondos—las cortes pueden y deben declararla nula. *San Juan Trading* v. *Sancho,* supra, y aun en este caso entre tres jueces que intervinieron hubo uno parcialmente concurrente y otro disidente. Y es que no existe, ni puede existir, una regla fija en cuanto a lo que constituye razonabilidad en las clasificaciones para fines contributivos. "En una clasificación para fines gubernamentales no puede haber una exacta exclusión o inclusión de personas o cosas", *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283 (1898) y "las cortes invariablemente si encuentran alguna posibilidad de hacerlo, sostienen la actuación legislativa.... pues reconocen que imponer contribuciones presenta un problema práctico; que la igualdad exacta es completamente imposible y que la discreción legislativa debe sostenerse si puede serlo." *State* v. *Welsh,* 251 N. W. 189, 213.

De acuerdo con la forma en que está redactada la sección 1 de la ley, supra, de no haberse eximido de sus términos los ingresos provenientes de contratos de compraventa, no hay

duda que, en su alcance general, la contribución podría considerarse, en ese aspecto, como una sobre las ventas. Empero, la Legislatura consideró conveniente eximir esta clase de ingresos. ¿Tuvo algún motivo de política pública o económica justificable para así hacerlo? La razón pudo ser, sin que resolvamos que sea buena o mala, pues no es esa función que corresponda a las cortes, la acción legislativa derogando el impuesto del 2 por ciento sobre las ventas que había existido desde el año 1927. Por motivos que tampoco incumbe a esta Corte resolver si estaban o no justificados con una política de sana economía pública, la Legislatura consideró conveniente eliminar dicho impuesto y así lo hizo por la Ley núm. 29 aprobada el 12 de abril de 1941 ((1) pág. 469).

Al aprobar la Ley sobre el Impuesto de la Victoria en 1942, la Legislatura, congruente con su actuación anterior derogando el impuesto del 2 por ciento sobre las ventas, eximió del pago del 5 por ciento, que provee la ley, sobre los ingresos percibidos a virtud de contratos de compraventa con la limitación señalada. ¿Puede considerarse que esta exención o clasificación es irrazonable o arbitraria? Creemos que no. Habiendo eximido las ventas del pago de un impuesto de 2 por ciento no parecería lógico imponerle poco después un tributo de 5 por ciento al ingreso bruto obtenido a virtud de contratos de compraventa, que de hecho incluirían todos los ingresos provenientes de las ventas realizadas en la Isla.

No encontramos en la exención discrimen en contra del peticionario. Los ingresos que el peticionario pueda obtener a virtud de cualquier contrato de compraventa en que intervenga, está exento del Impuesto de la Victoria, al igual que lo están los de un comerciante o agricultor.

Aun cuando el aparente propósito de la ley sugerido por el representante del Procurador General en la vista oral, es decir, que es una medida tendiente a evitar la inflación durante la presente emergencia, pueda ser o no sostenible desde el punto de vista de los economistas, tampoco estamos justificados en rechazarlo, ni obligados a expresar opinión sobre

el mismo. Los economistas y los abogados no suelen tener los mismos puntos de vista en la interpretación de leyes contributivas. Como ha dicho T. R. Powell, en su ensayo "New Light on Gross Receipts Taxes" en 53 Harv. L. Rev. 909, 924 (1940): "El universo del raciocinio legal y el universo del raciocinio económico no son siempre el mismo." Así tenemos que la reconocida autoridad en materia contributiva sobre ingresos, Randolph Paul, en su reciente conferencia sobre *Federal Taxation in Total War,* publicada en 38 Cornell Law Quarterly 141 (enero 1943), al referirse a la contribución sobre las ventas como medida para evitar la inflación, dijo:

"La contribución sobre las ventas es un instrumento demasiado tosco (*crude*) para que pueda realizar una labor efectiva en el control de la inflación. No es sensitivo a diferencias en la capacidad para gastar. Todas las personas pagan el mismo tipo contributivo bien contribuyan con un dólar o con un millón de dólares a la corriente inflacionaria del poder para gastar. Así, la contribución no discrimina entre aquellas personas que pueden reducir sus compras sustancialmente y aquellas que no puedan hacerlo. En consecuencia, es imposible imponer una contribución sobre ventas a tipos suficientemente altos para reducir el consumo de personas cuyas normas de vida son liberales, sin que al mismo tiempo se imponga una carga intolerable a millones de ciudadanos. Si se impone a tipos bajos, la contribución sobre ventas ejercería poca o ninguna influencia restrictiva sobre aquellas personas que están en la mejor posición para reducir sus normas de vida."

Ni aceptamos ni rechazamos los puntos de vista de Paul sobre el alcance económico de la ley de ventas como medida para evitar la inflación. Es una opinión que pudo considerar razonable la Legislatura. Que tuvo en mente y tomó en consideración la situación económica existente en la Isla al aprobarse la medida de emergencia y que dicha situación podía variar aún durante su vigencia limitada, lo demuestra el artículo 6 de la ley, que provee lo siguiente:

"Cuando el índice de precios al por menor de los alimentos básicos de Puerto Rico, según enumerados en adelante, alcance al nivel

del mes de junio de 1941, la exención establecida para el Impuesto de la Victoria impuesto en esta Ley, será de doce dólares con cuatro centavos ($12.04) para cada semana y un dólar setenta y dos centavos ($1.72) para cada día, cuando proceda computar por días según el artículo 5. El índice se computará por la Oficina de Estadísticas del Gobernador de Puerto Rico a base de los precios que informe el Departamento de Agricultura y Comercio. Se usará el sistema de relativos ponderados (*weighted relatives*). La ponderación se hará a base del consumo de las clases obreras de Puerto Rico en estos productos, según se determine por el estudio de ingresos y gastos de los obreros del Departamento Insular del Trabajo en cooperación con la Work Projects Administration (W.P.A.). Se incluirá para la computación del índice los siguientes productos: arroz, habichuelas, harina de maíz, manteca, jamón, tocino, bacalao, cebollas, papas, plátanos, yautías, batatas, leche, café y azúcar. El Gobernador de Puerto Rico promulgará, mediante proclama, la fecha en que el precio de estos productos baje al nivel de junio de 1941.''

Si aunamos a las anteriores consideraciones el hecho de que, como sostiene Paul, supra, una contribución sobre las ventas no tendría resultados efectivos en el control de la inflación, tendríamos que convenir que la Legislatura pudo creer que la eliminación de dicha contribución sí podría tender a evitarla y, siendo esto así, debemos aplicar la regla expuesta por el Juez Stone, citada anteriormente, de que: ''Si aparece o puede razonablemente asumirse que (la clasificación) es con el propósito de promover un fin público permisible, no puede ser condenada porque una clase deba pagar una contribución que otra no paga.'' Es más, en el año 1941 el Congreso de Estados Unidos aprobó el Suplemento ''T'' al Código de Rentas Internas a virtud del cual se estableció una contribución sobre el ingreso bruto a elección de individuos cuyo ingreso bruto al año fuera de $3,000 ó menos y consistiera enteramente de uno o más de los siguientes: ''sueldos, salarios, compensaciones por servicios personales, dividendos, intereses o anualidades.'' 26 U.S.C.A. §400. Es de notarse que aun cuando esta contribución es opcional con el contribuyente, sólo pueden acogerse a ella los que perciban $3,000 ó menos, y además, que sus ingresos provengan exclu-

sivamente de las fuentes expuestas en la clasificación que hemos copiado, las cuales por cierto, son bastantes similares a las de nuestra ley.

El propio representante del peticionario admitió en la vista oral que si la Legislatura al hacer la exención hubiera especificado determinadas transacciones de compraventa la ley sería válida. De hecho esto fué lo que la Legislatura hizo pues las limitó a aquéllas en que el ingreso fuera percibido por quien hubiera actuado como contratante, exención que cobija, como hemos dicho antes, aquellas operaciones de compraventa en que el peticionario haya actuado como tal y percibido ingresos.

Aun cuando la contribución sobre ingresos no es considerada legal o económicamente como una contribución sobre el origen, *Graves* v. *N. Y. ex rel. O'Keefe,* supra; *Ballester* v. *Tribunal de Apelación,* supra, somos de opinión que la clasificación hecha a base del ingreso bruto no viola *per se* la cláusula sobre igual protección. Arguye el peticionario, sin embargo, que no ha encontrado ningún caso en el cual se haya hecho la clasificación a base de la "clase de ingreso, irrespectivamente del que lo recibe," y que por tanto la clasificación es inherentemente irrazonable. No tiene razón, a nuestro juicio, pues existen precedentes en la jurisprudencia. Veamos algunos ejemplos.

En *Marshall* v. *South Carolina Tax Commission,* 178 S. C. 57, 182 S. E. 96, *certiorari denegado* 296 U. S. 585, 56 S. Ct. 96, 80 L. Ed. 413, se decidió que un estatuto que impone una contribución a razón del cinco por ciento sobre los intereses o dividendos recibidos por una persona en exceso de cien dólares no es inconstitucional a base de que establece un discrimen arbitrario en contra de personas cuyos ingresos son derivados de intereses y dividendos y a favor de personas cuyos ingresos son derivados de otras fuentes. En *In re Opinion of the Justices,* 270 Mass. 593, 170 N. E. 800, se decidió que clasificar ingresos a base de la fuente de que son derivados, estableciendo una distinción entre "ingreso

neto derivado de transacciones comerciales" e "ingreso neto derivado de bienes intangibles" es una clasificación válida. En *McCutchan* v. *Oklahoma Tax Comm.,* ____ Okla. ____, 132 P. (2d) 337, se decidió que la contribución sobre ingresos de Oklahoma que autoriza completa exención personal a aquellas personas cuyos ingresos son percibidos enteramente dentro de la jurisdicción de Oklahoma, y solamente una exención personal parcial a aquellas personas cuyos ingresos son percibidos parte dentro y parte fuera de Oklahoma, no es inválida a base de que les niega la "igual protección de las leyes" bajo la Enmienda Catorce.

En junio 8, 1943 la Corte de Circuito de Apelaciones de los Estados Unidos para el Primer Circuito, al confirmar la sentencia de esta Corte Suprema en el caso de *Monllor & Boscio, Sucesores,* v. *Sancho Bonet,* 61 D.P.R. 67, tuvo ocasión de reiterar la doctrina que venimos comentando. Al referirse a la clasificación establecida por nuestra ley en la imposición en Puerto Rico de un tributo a los vinos fortificados y otro al alcohol usado para dicha fortificación, cuando los vinos importados sólo tenían que pagar el primer tributo, se expresó así:

"La contribución, sin embargo, es uniforme pues trata a todos los productores de vino que fortifican vinos en Puerto Rico en la misma forma *y la clasificación que ha adoptado tiene una base racional y no es irrazonable.* Como se dijo en *Henneford* v. *Silas Mason Co.,* 300 U. S. 577, 587:

" 'Un estado [territorio], para muchos fines, debe reconocerse como una unidad completa, que puede construir su propio sistema de cargas y exenciones sin tomar en cuenta sistemas de cualquier otra parte.' "

El Impuesto de la Victoria provisto por la ley dejará de imponerse y cobrarse seis meses después del cese de hostilidades entre Estados Unidos y Alemania, Italia y Japón. Es una medida de emergencia. Se arguye, sin embargo, que nada hay en la ley que indique que el importe total de lo recaudado a virtud de la contribución vaya, en alguna forma,

a contribuir al esfuerzo de ganar la actual guerra. El argumento carece de méritos. El peticionario admitió en la vista oral que no atacaba el impuesto porque se tratara de una contribución especial cuyo importe ha de ingresar en los fondos generales del Tesoro en violación del párrafo 23 del artículo dos de la Ley Orgánica. Siendo esto así, no tenemos duda de que la Legislatura estuvo justificada en proveer nuevas fuentes de ingresos para los fondos generales del Gobierno para conjurar en parte la situación económica creada en Puerto Rico con motivo de la emergencia de guerra. El hecho de que haya divergencia de opinión en cuanto a lo apropiado del nombre o calificativo que se dé a una ley es inmaterial. Sigamos el consejo del Juez Holmes y "pensemos cosas y no palabras." Frankfurter: Mr. Justice Holmes and the Supreme Court, 57. A los fines de la victoria final en el actual conflicto no sólo hay que proveer para la debida atención del frente de guerra sino que al mismo tiempo hay que favorecer, atender y no abandonar el frente doméstico.

Repetimos que no estamos expresando opinión alguna sobre la sabiduría, practicabilidad o política envuelta en la ley de la contribución impuesta. Misión es ésa que no nos corresponde. *Ballester* v. *Tribunal de Apelación,* supra, pág. 507. Es más difícil y sutil resolver, como ha dicho el Juez Frankfurter, "no si la legislación es sabia, sino si los legisladores fueron razonables al creer que era sabia." Obra citada, pág. 30. En el caso de autos creemos que la Legislatura no violó la cláusula sobre igual protección al aprobar el llamado Impuesto de la Victoria.

Sostiene por último el peticionario que la ley es nula porque su título viola el párrafo 8 de la sección 34 de la Ley Orgánica que dispone que:

"No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título; pero si algún asunto que no

esté expresado en el título fuere incluído en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en el título.''

El título de la ley impugnada dice así:

''Para proveer rentas para El Pueblo de Puerto Rico mediante la imposición de cierta contribución adicional sobre ingresos que se conocerá como 'El Impuesto de la Victoria'; para asignar fondos para la ejecución de esta Ley, y para otros fines.''

Admitimos que este título dista mucho de ser un modelo de perfección, pero creemos que al informar que el propósito de la ley es imponer ''cierta contribución adicional sobre ingresos'', el hecho de que deje de especificar que se imponen sobre determinados ingresos brutos, o de expresar las exenciones contenidas en la ley, no lo hace legalmente insuficiente.

Esta Corte ha resuelto, entre otros, en el caso de *Vázquez v. Junta de Síndicos,* 59 D.P.R. 145, 148, que ''Conteniendo un solo asunto la ley en controversia, su título es suficiente, no siendo necesario que en el mismo aparezcan todos los detalles de la ley, ni que dicho título constituya un índice innecesario de la misma''.

El propósito del principio constitucional contenido en el artículo 34, supra, ha sido expuesto en *Posados* v. *Warner, B. & Co.,* 279 U. S. 340. Es: ''impedir la inclusión en la ley de materia incongruente y extraña, y a la vez poner en guardia contra la inadvertencia, la ocultación y el fraude en la legislación,'' o como se dijo en *Louisiana* v. *Pilsbury,* 105 U. S. 278: ''evitar la práctica, corriente en todas las legislaturas donde no existe tal disposición, de incluir en la ley materias incongruentes que no tienen relación alguna entre sí o con el sujeto especificado en el título, a virtud de lo cual se aprueban medidas sin atraer atención que, si hubieran sido vistas, hubieran sido impugnadas y derrotadas. Así parece evitar sorpresas en la legislación''.

La ley en este caso sólo trata de un asunto: la imposición de cierta contribución adicional sobre ingresos a la cual

se le da el nombre de Impuesto de la Victoria. Nada hay incluído en ella que sea incongruente con el sujeto especificado. El hecho de que no se especifique en el título la clase de ingresos a la cual se impone la contribución no hace nula la ley. Hubiera sido mejor y más claro dicho título si así se hubiera hecho, pero en la forma en que está redactado informa claramente que es una contribución adicional sobre ingresos, y no habiéndose incluído en el texto de la ley ninguna otra clase de contribuciones, como por ejemplo sobre la propiedad, licencias o arbitrios, somos de opinión que es suficiente. Véase *Christopher* v. *James,* 12 S. E. (2d) 813 (1941). Que la ley no contenga nada que explique o justifique el nombre que se le da a la contribución, tanto en el título como en la sección primera, supra, no es suficiente para que la declaremos nula. En cuanto a este aspecto nos remitimos a lo que hemos dicho anteriormente en esta opinión al resolver el segundo error.

Tampoco es necesario que en el título de una ley contributiva se especifiquen las exenciones que aparezcan en el cuerpo de la misma. *Kull* v. *Michigan State Apple Commission,* 296 N. W. 250; *State* v. *Erickson,* 244 Pac. 287.

Sólo en un caso claro y terminante estaríamos justificados en anular una ley por deficiencias en su título en violación del artículo 34, supra. *Cf. Rodríguez* v. *Corte,* 60 D.P.R. 919. No creemos que el de autos lo sea.

*Debe declararse sin lugar la petición y anularse el auto expedido.*

El Juez Presidente Sr. Del Toro no intervino.

El Juez Asociado Sr. Snyder, aunque no estuvo presente al firmarse esta opinión y la sentencia, intervino en las conferencias en que se discutió dicha opinión y concurre con la misma.