434

GOBIERNO DE LA CAPITAL, demandante y apelado, *v.* CONSEJO
 EJECUTIVO DE PUERTO RICO, ETC., y LA AUTORIDAD DE
 FUENTES FLUVIALES DE PUERTO RICO, demandados y ape-
 lantes.

Núm. 8703.—*Sometido:* Febrero 1, 1944. *Resuelto:* Abril 20, 1944.

*Hon. Procurador General Interino M. Rodríguez Ramos*, abogado del Gobernador, el Consejo Ejecutivo .y la Autoridad de Fuentes Fluviales de Puerto Rico y *James E. Curry, Alberto Picó Santiago, Conrad J. Shearer* y *Raúl Trujillo Santiago, of counsel,* Autoridad de Fuentes Fluviales de Puerto Rico; *F. Fernández Cuyar* y *H. González Blanes*, abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

Este caso presenta una sola cuestión. ¿Es válida una ley que autoriza la transferencia sin compensación del acueducto de un municipio a una agencia insular? En un recurso de sentencia declaratoria iniciado por el Gobierno de la Capital contra los miembros del Consejo Ejecutivo y la Autoridad de Fuentes Fluviales, la corte de distrito resolvió que la Ley aquí envuelta era inconstitucional por el fundamento de que privaba al municipio de su propiedad sin una justa compensación. El caso se encuentra ante este Tribunal en apelación de dicha sentencia.

No nos detendremos a examinar el argumento de los apelantes en cuanto a que "para obtener el más completo y más efectivo uso de las fuentes fluviales de la Isla para tales propósitos como los de producción de energía eléctrica, riego y abastecimiento público de agua, se necesita una acción unificada y coordinada". El municipio no refuta esta proposi-

ción. Acepta el poder del Gobierno Insular para obtener el dominio y funcionamiento del acueducto. El municipio funda su caso en el requisito de la Carta Orgánica exigiendo una justa compensación cuando se toma propiedad *privada* con el propósito de utilizarla para fines *públicos*.

Del mismo modo echaremos a un lado las disposiciones de la Ley [1] al efecto de que el traspaso de un acueducto municipal a la Autoridad de Fuentes Fluviales de conformidad con la misma, no es automático y no puede realizarse hasta que se haya decidido que la calidad, cantidad y regularidad del agua suministrada a los habitantes del municipio no llenan el "standard" exigido, y que esto sólo puede decidirse después de la correspondiente vista, estando dicha decisión sujeta a revisión judicial. Cualesquiera que sean los salvaguardas que pueda la Ley interponer contra actuaciones arbitrarias por parte de las autoridades insulares, queda el hecho de que la compensación al municipio provista en la Ley para el caso de tal traspaso, deja de ser la compensación justa exigida por la Sección 2, párrafo 9, del Acta Orgánica.[2]

Aquí también las partes están contestes. Los apelantes admiten que la Ley núm. 39 no provee para tal compensación. Basan su caso en la contención de que la corte de distrito cometió error al resolver que esta disposición constitucional es aplicable a controversias entre el municipio y su creador, el Gobierno Insular; más bien afirman que de conformidad con los requisitos y salvaguardas contenidos en la Ley núm. 39, según quedó enmendada, un acueducto propiedad de un municipio puede ser traspasado a una agencia insular sin que se compense por el mismo al municipio. De la validez de tal proposición depende la resolución de este caso.

[1] Ley núm. 39, Leyes de Puerto Rico, 1941, Sesión Extraordinaria (pág. 140), tal como fué enmendada por la Ley núm. 29, Leyes de Puerto Rico, 1942 ((1) pág. 411).

[2] "La propiedad particular no será tomada . . . para uso público, a no ser mediante el pago de una justa compensación . . . ." (Título 48 U.S.C.A. §737).

## I

■ La teoría de la Capital en este caso emana de la distinción que existe en los casos entre (1) propiedad poseída y usada por un municipio en su capacidad pública, gubernativa o soberana, y (2) propiedad poseída y usada por un municipio en su capacidad privada o de propiedad. La Capital no alega que el estado debe compensar al municipio si aquél traspasa propiedad retenida, por el municipio en su capacidad gubernativa. Pero sí alega que el estado no puede obtener propiedad poseída por el municipio en su capacidad de propiedad a no ser mediante una justa compensación. Y su posición en este caso es al efecto de que la Capital posee el acueducto en su capacidad de propiedad; y que en su consecuencia, la Ley núm. 39, que autoriza el traspaso del acueducto de la Capital a la Autoridad de Fuentes Fluviales sin una justa compensación, está en conflicto con la Sección 2, párrafo 9, del Acta Orgánica, y por consiguiente, es nula.

Por tanto, se hace imperativo que escrutemos la distinción existente entre las funciones gubernativas y de propiedad de un municipio. Empezaremos por indicar que esta distinción, al menos en el derecho común, es legislación judicial, y encuentra sus más frecuentes expresiones en el campo de los daños y perjuicios. Allí su propósito es obvio. El soberano, a menos que dé su consentimiento, es inmune a los pleitos, y esta inmunidad es heredada por un municipio como agente del estado. Los empleados municipales al realizar funciones municipales, algunas veces son negligentes en perjuicio de individuos privados. Por tanto, para escapar a la doctrina de inmunidad las cortes en el pasado han elaborado, en el campo de la ley de daños y perjuicios, una distinción entre actividades gubernativas y privadas de los municipios. Se hizo responsables a los municipios por todos los daños ocasionados por sus agentes en el desempeño de funciones privadas o de propiedad.

La distinción, a pesar de estar totalmente empotrada en la ley, es difícil de exponer. No hay molde dentro del cual encaje cada función. Lo más que puede decirse es que las cortes en cada jurisdición, guiadas por sus propias nociones de política pública, y mediante el sistema de casos de inclusión y exclusión, han desarrollado gradualmente un grupo de precedentes sobre la materia. Algunas cortes, sin embargo, han creído, con mayor firmeza cada día, que las sutiles distinciones que de esta manera se obtienen son tan ilógicas como injustas. Esta Corte comparte dichos recelos. En nuestra más reciente expresión sobre la materia señalamos la anomalía de hacer a un municipio responsable por la negligencia del chófer de un vehículo del acueducto, y de eximirlo de responsabilidad si dicho chófer hubiera manejado una bomba de incendio propiedad del municipo (*Davidson* v. *Hettinger, etc., et al.*, 62 D.P.R. 301). En dicho caso afirmamos que (págs. 310–311) "Con razón a nuestro juicio, Borchard . . . dice que no existe razón aparente para sostener que las funciones públicas o gubernativas no pueden ser efectuadas debidamente a menos que el municipio sea inmune de responsabilidad por la negligencia de sus funcionarios . . . . por lo menos respondería más satisfactoriamente al sentido de justicia pública, si los daños causados al individuo por los actos torticeros de los agentes de la comunidad se reparten entre toda la comunidad, más bien que permitir que recaigan exclusivamente sobre la infortunada víctima". Por tanto, resolvimos en el caso de *Davidson* que aunque la conservación de las calles y carreteras se lleva a cabo por el municipio en su capacidad gubernativa, no obstante el municipio era responsable por actos negligentes de sus empleados al ocuparse en tales funciones.

De esta manera vemos que esta Corte, y otras, al confrontarse con los hechos de la vida moderna, han rehusado adherirse a conceptos de derecho fuera de moda creados por las cortes en el pasado como una regla de conveniencia

para ajustarse a las condiciones que entonces prevalecían.[3] Sería inútil tratar de ocultar el hecho de que hemos llegado hasta casi a abolir la doctrina de que la actividad gubernativa inmuniza a los municipios de responsabilidad de daños y perjuicios. El conceder que la conservación de las aceras es una función gubernativa y no privada y afirmar luego que en este caso específico forjaremos una excepción a la regla de inmunidad a la responsabilidad de daños y perjuicios por razón de actividad gubernativa, equivale a abrir las puertas a otras excepciones en otros casos apropiados. Otras jurisdicciones — sabiamente, creemos — han aprobado estatutos arrolladores abandonando la inmunidad de los municipios y de otras agencias gubernamentales en cuanto a responsabilidad por daños y perjuicios; y el Gobierno Federal actualmente está considerando igual medida. En síntesis, la distinción entre actividad gubernativa y privada de un municipio ha sido despojada de mucho de su contenido en el campo de la ley de daños y perjuicios.

Pasando a la cuestión específica ante nos, no tratamos de determinar si la distinción entre las funciones gubernativas y de propiedad de un municipio tuvo su origen en el campo de la ley de daños y perjuicios o en el de la ley de propiedad. Sospechamos que tuvo su génesis en un caso de daños y perjuicios, al menos en el derecho común. Ciertamente el razonamiento detrás de ella, aunque decayendo rápidamente bajo el impacto de la vida moderna y el alcance progresivo de las actividades gubernativas, es más evidente en un caso de daños y perjuicios. De cualquier modo, la cuestión de si existe la distinción en el campo de la propiedad, por lo menos con el efecto atribuídole por el apelado, es nueva en esta jurisdicción. Y su importancia en este caso es manifiesta: alega el municipio que tiene título al acueducto en su capa-

---

(3)*Cf. Carrasquillo* v. *Am. Missionary Ass'n,* 61 D.P.R. 867, donde indicamos que aun las corporaciones benéficas no pueden ya seguir esperando confiadamente en todos los casos la inmunidad por los daños y perjuicios causados debido a la negligencia de sus empleados.

cidad de propiedad; afirma que el Gobierno Insular puede traspasar el título al mismo solamente mediante procedimiento de expropiación en el que la Capital reciba una justa compensación por el acueducto, asignándole al acueducto un valor de $7,000,000.

Los abogados de ambas partes han hecho un esfuerzo prodigioso para anotar los casos y textos que sostienen sus respectivas teorías. En particular los abogados de los apelantes han ido muy lejos con el fin de examinar los hechos y las decisiones de cada caso citado por el apelado, en un esfuerzo para proyectar dudas en su autoridad en cuanto a este caso. No vemos fin práctico alguno en repasar estas gestiones de los abogados. Sería suficiente decir que, no obstante el gallardo esfuerzo de los apelantes en explicar la no aplicación de los casos, no puede negarse que la mayoría de las cortes estatales que han considerado el asunto, como cuestión de derecho común, bien en *dicta* o en decisiones, han establecido, aun en el campo de la ley de propiedad, una distinción entre propiedad poseída por un municipio en su capacidad gubernativa y aquella poseída en su capacidad de propiedad y se han adherido a la doctrina de que los municipios no pueden ser privados por el estado de propiedad poseída por ellos en su capacidad privada sin justa compensación.[4] Alegan los apelantes que sin excepción al-

---

(4) The *People* v. *Hurlbut*, 24 Mich. 44, 9 Am. Rep. 103 (1871); *Board of Park Commissioners* v. *Common Council of Detroit*, 28 Mich. 227, 15 Am. Rep. 202 (1871); *Proprietors of Mt. Hope Cemetery* v. *City of Boston*, 33 N.E. 695 (Mass., 1893) (comentado en sentido adverso en 36 Harv. L. Rev. 465. Es difícil reconciliar el voto de Holmes en favor de esta decisión con su conformidad en *Trenton* v. *New Jersey*, 262 U.S. 182); *State* v. *Barker*, 89 N.W. 204 (Iowa, 1902); *City of Lexington* v. *Thompson*, 68 S.W. 477 (Ky., 1902); *State* v. *Fox*, 63 N.E. 19 (Ind., 1902); *Shirk* v. *City of Lancaster*, 169 A. 557 (Pa., 1933), con el cual compárese *Lighton* v. *Abington Tp.*, 9 A. (2d) 609 (Pa., 1939); *State* v. *Holmes*, 47 P. (2d) 624 (Mont., 1935), mas compárese *State* v. *City Council of City of Helena*, 90 P. (2d) 514 (Mont., 1939), en el cual se resolvió que los caseríos públicos eran gubernativos; *Chadwick* v. *City of Crawfordsville*, 24 N.E. (2d) 937 (Ind., 1940); *Benwood-McMechen Water Co.* v. *City of Wheeling*, 4 S.E. (2d) 300 (W. Va., 1939); *Town of Winchester* v. *Cox*, 26 A. (2d) 592 (Conn., 1942).

guna estos casos estatales emanan de *dicta* antiguos de la Corte Suprema de Estados Unidos que fueron repudiados por la misma Corte Suprema en *Trenton* v. *New Jersey*, 262 U. S. 182, que se discute más adelante en detalle. Toça a dichas cortes estatales decidir la cuestión en cuanto a si las mismas cambiarán sus conclusiones, como alegan los apelantes, cuando vigorosamente se les llame la atención al caso de *Trenton* v. *New Jersey*. Nos limitaremos a determinar si resolvemos adoptar en esta jurisdicción la regla que se admite ha sido establecida por estos casos.

Sin embargo, creemos apropiado indicar, antes de abandonar la cuestión de la regla en otras jurisdicciones, que muchas de estas decisiones, bien expresamente o por implicación, están predicadas en disposiciones de gobierno propio (*home rule*) en cuanto a municipios, contenidas en varias constituciones estatales. Desde luego, tal disposición no existe en nuestra Carta Orgánica. Por el contrario, los municipios de Puerto Rico son meras subdivisiones del Gobierno Insular, completamente sujetas a su voluntad (*Pueblo, ex rel. Castro,* v. *Padrón Rivera,* 60 D.P.R. 798). En verdad, el Acta Orgánica otorga a la Legislatura "la facultad de crear, consolidar y reorganizar los municipios . . . y . . . derogar leyes y ordenanzas para los mismos . . .". (Título 48 .U. S. C. A. sec. 821). Por tanto, estos casos de gobierno propio no tienen validez alguna en esta jurisdicción. .

Además, aun en algunos estados donde no se encuentra disposición constitucional alguna de gobierno propio, la armonía de dichó principio ha afectado el desarrollo de la ley sobre esta materia. Las cortes tienen conocimiento como otros de la encarnizada batalla que ha surgido en los frentes locales y nacional entre las teorías de centralización y descentralización en el Gobierno. Quizá ha sido humano en dichas cortes el permitir que sus conclusiones sobre dicha cuestión influyan subconscientemente los resultados obtenidos en pleitos ante ellas. Pero la cuestión envuelta es política, no

judicial. El Congreso ha ordenado que los municipios de Puerto Rico no tengan gobierno propio. Esta corte no tiene derecho, bien indirectamente o de cualquier otro modo, para conferírselo.

Al discutir los casos sobre esta cuestión, los abogados de los apelantes afirman que muchas cortes estatales cometieron error al aceptar sin análisis los *dicta* de los jueces de mentes vigorosas de una generación anterior, como Story y Cooley. Convenimos con ellos, de estar en libertad de ejercitar nuestro criterio independiente en este caso, que tal adhesión ciega a los precedentes de otras jurisdicciones no debe ser nuestra pauta.[5] Por tanto, nos remitimos al problema de determinar si la teoría del apelado y de la corte de distrito puede justificarse por principio y por razón.[6]

El primer paso a dar en un debate basado en la lógica es el de tratar de definir los términos de la proposición que se debate. Pero, como ya hemos visto en nuestro examen de esta proposición tal como se expone en el campo de la ley de daños y perjuicios, nunca se ha trazado con precisión línea divisoria alguna entre las funciones privadas y gubernativas de un municipio.[7] Es difícil resistirse a la conclu-

---

[5] El juez de distrito escribió una opinión cuidadosa y hábil que ha sido de gran ayuda para esta Corte. Indicó el juez en efecto que se sentía obligado a seguir el gran peso de las autoridades en las cortes estatales. Este punto de vista del juez, actuando en la corte de distrito, es de comprenderse y por tanto no lo criticamos por ello. Pero siendo nuestro deber, como la Corte más alta de esta jurisdicción, establecer la ley local sobre esta cuestión nueva, las autoridades de otras cortes estatales no pueden obligarnos sobre una cuestión de esa magnitud, a menos que estemos convencidos de la pureza de su razonamiento.

[6] "Al presente cualquier objeción que los hombres no examinen y discutan se convierte en prejuicio." Walter Lippman, United States Foreign Policy, pág. 43.

[7] El Juez Jackson, en su conclusión al efecto de que el término utilidad pública incluía ciertos almacenes en algunos estados bajo la Ley Federal de Emergencia para el Control de Precios, dijo, hablando por la Corte Suprema, en *Davies Warehouse Co.* v. *Bowles,* ____ U.S. ____, resuelto el 31 de enero de 1944: "El uso de ese término en un sentido general exhibe una apariencia de precisión que resulta ilusoria cuando se hace necesaria una aplicación precisa del mismo. Las autoridades y consideraciones relevantes son numerosas y ambiguas, y de un mero cambio de énfasis surgen definiciones distintas y plausibles."

sión de que la distinción en dicho campo era enteramente artificial. Se admite que fué una ficción legal. Sin embargo, no importa la falta de lógica que pudo haber tenido, cumplió el útil propósito de imponerle responsabilidad a los municipios por los daños de sus agentes. Pero cuando tratamos de examinar las funciones de un municipio aparte de las exigencias compulsorias de la ley de daños y perjuicios, es difícil asimilar el concepto de que hay una diferencia radical, por ejemplo, entre extinguir incendios y suplir el agua para extinguirlos. No nos querellamos con las decisiones, incluyendo la nuestra, que han utilizado tal distinción como una regla de conveniencia para cumplir los fines de la justicia en un caso de daños y perjuicios (*Colón* v. *Gobierno de la Capital,* 57 D.P.R. 15). Pero nos ha sido imposible descubrir la conveniencia o la justicia envueltas al trasplantar esta doctrina moribunda al terreno extraño de la ley de propiedad. No podemos eludir el hecho de que el municipio, bajo nuestra Acta Orgánica, es una mera subdivisión o agencia del estado (*Pueblo ex rel. Castro* v. *Padrón Rivera,* supra, a la pág. 808) y que sus ordenanzas pueden ser derogadas por la legislatura (Títulos 48 U.S.C.A. sec. 821).[8] ¿Cómo puede decirse, por tanto, que el municipio tiene un derecho adquirido para continuar poseyendo y operando su acueducto, del cual no pueda privarle la legislatura sin compensación alguna?

---

(8) Reconocemos que en el caso de *Colón* v. *Gobierno de la Capital,* 57 D.P.R. 15, este tribunal refiriéndose al acueducto de la Capital, dijo a la pág. 18: ''El municipio no está obligado por ley alguna a suministrar agua a los habitantes de la municipalidad. Al hacerlo, el municipio actúa por su propia cuenta, mediante paga y para su propio beneficio. *No actúa por delegación ni como agente del estado.* Actúa en su capacidad de corporación o persona jurídica.'' (Bastardillas nuestras.) No repudiamos dicho lenguaje en tanto en cuanto se aplica a los hechos de aquel caso. Indicamos solamente que no puede aplicarse en términos generales, sino que debe leerse a la luz de los hechos del caso de *Colón.* Allí la fórmula de una actividad del Municipio privada y no gubernativa, fué usada para alcanzar el resultado justiciero de responsabilidad por parte del municipio en daños y perjuicios. Por tanto el lenguaje citado sólo se aplica a los hechos de dicho caso, y no puede extenderse para ser aplicado generalmente o en casos específicos donde, como en el presente caso, no es apropiado.

La contención del apelado requiere que aceptemos sin previo examen la afirmación dogmática de que hay dos categorías rígidas de propiedad perteneciente a los municipios, y que un acueducto cae dentro de la categoría privada o de propiedad, y no dentro de la gubernativa o pública. Nunca repetiremos suficientemente nuestra convicción de que ésta es una distinción de conveniencia que debe su existencia al menos en el derecho común, principalmente a las exigencias de la ley de daños y perjuicios. Cuando examinamos la cuestión libre de las inhibiciones de las definiciones creadas para cumplir los propósitos de la ley de daños y perjuicios, inmediatamente se nos lleva a inquirir—¿cómo puede un organismo organizado para fines gubernativos tener título a una propiedad y operar la misma excepto para fines gubernativos? Sería inconcebible para un lego, por ejemplo, si se le dijera que las agencias *gubernativas* se dedican a actividades *privadas*. Tal ficción legal debería existir únicamente si cumple un propósito útil. Aquí ninguno encontramos.

El resumen de ello es que muchas cortes se han enredado en el formulismo de esta distinción artificial debido a su negativa de reconocer la diferencia de su aplicación en el campo de la ley de daños, y en el de la ley de propiedad. Preferimos desembarazarnos de dicho dilema resolviendo que la distinción no cumple ningún propósito útil en la cuestión ante nos. Por tanto concluímos que a los fines de este caso es inmaterial el que resolvamos que el Gobierno de la Capital tiene un título sobre el acueducto municipal en su capacidad privada o gubernativa. Lo que es importante es que la propiedad es poseída y operada por un agente del estado, y que el estado como principal puede cambiar el fiduciario que la opera.

Usamos el término "fiduciario que la opera" deliberadamente. Es importante indicar que la ley ante nos no le da

poder a la agencia insular para desmontar un acueducto mu-. nicipal y venderlo o usarlo en cualquier otra parte. La ley cuidadosamente protege contra tal conducta. Provee que cada acueducto obtenido bajo esta ley continuará siendo operado como en la actualidad para el uso y beneficio de los habitantes de la comunidad que ahora sirve. Esto sería en efecto un mero cambio de administración para el acueducto envuelto. Los apelantes entienden que la ley no fué ni podía ir más lejos.[9]

No nos preocupa la imputación de que llamamos público lo que algunas cortes en el pasado han llamado privado. "Y el concepto de bienestar general tampoco es estático. Las necesidades que eran limitadas y sin importancia un siglo ha, pueden estar en nuestros días en íntima relación con el bienestar de la Nación. Lo que es imperativo o urgente cambia con los tiempos." (El Juez Asociado Sr. Cardozo en *Helvering* v. *Davis*, 301 U.S. 619, 641). Es obvio decir que el Gobierno ha extendido sus funciones en los últimos años. Muchos asuntos que una vez se pensó estaban fuera del alcance de las funciones gubernativas, tales como auxilio y vivienda, son ahora aceptados como parte de la escena gubernativa local y nacional. En verdad, muchas de las cortes que habían resuelto que solamente propiedad poseída por un municipio en su capacidad gubernativa podía ser traspasada a una agencia estatal, sin compensación, se han visto más tarde obligadas a resolver que tales asuntos como la transportación y la vivienda, que por generaciones se pensó que eran

---

[9] En su alegato de réplica los apelantes hacen la siguiente manifestación: "Los apelantes no defienden aquí el derecho de El Pueblo de Puerto Rico a tomar el acueducto de San Juan, desmontarlo y enviarlo a Mayagüez o Ponce para ser usado por los habitantes de dichas comunidades. La Ley de Acueducto efectivamente dispone que se continuará usando para los mismos fines que antes y para beneficio de la misma comunidad. Aun si la ley no lo dispusiera así, la propiedad probablemente tendría la calidad de un 'trust' a los fines por los cuales fué adquirida, tal como se indicó en el caso de *Kelley* v. *Brunswick,* 187 Atl. 703 (1936), citado por los propios apelados."

puramente privadas, eran actividades gubernativas con el fin de permitir que el estado intervenga en tales asuntos.[10]

Los gobiernos regulan ahora negocios como "afectados de un interés público" que han sido tradicionalmente privados (*Pueblo* v. *Roig,* resuelto en 1 de febrero de 1944, ante, pág. 18). ¿Es que podemos decir que el suministro de agua no es tan vital a una comunidad como la molienda de caña de azúcar, y está menos "afectado de un interés público" que aquélla?[11] Escasamente tenemos que añadir que reconocemos la diferencia entre la reglamentación en la molienda de caña de azúcar y la obtención de propiedad sin compensación. Pero los intereses de individuos privados dedicados a una empresa privada con fines pecuniarios, no están envueltos en el caso ante nos. La propiedad aquí envuelta es poseída por una agencia gubernativa, bien se le llame propiedad gubernativa o bien privada. Dicha agencia gubernativa es una subdivisión de su principal, y actúa en beneficio de los habitantes de todo el municipio. Bajo tales circunstancias, agarrarse a la clasificación de "capacidad de propiedad" para justificar un derecho adquirido de propiedad privada en el título de la propiedad de un agente público en contra de su principal, el estado, sería razonar en un vacío.

El resultado final de la cuestión es que, aunque el suministro de agua a la comunidad podría haber sido dejado en manos privadas,[12] como en otras jurisdicciones, si La Capital, actuando bajo la autoridad otorgádale por la legisla-

(10) Casos de Massachusetts discutidos en 36 Harv. L. Rev. 465, *State* v. *City Council of City of Helena,* 90 P. (2d) 514 (Mont., 1939); *Simon* v. *Northup,* 40 P. 560 (Ore., 1895).

(11) Para excelentes exposiciones del elevado propósito público envuelto en el suministro de agua por el municipio a sus habitantes, véanse *David* v. *Portland Water Committee,* 14 Ore. 98 (1886); *State* v. *Walmsley,* 162 So. 826, 842-3 (La., 1935); *Brush* v. *Commissioner,* 300 U.S. 352.

(12) Indicamos entre paréntesis que si se hubiere hecho esto, no puede haber duda de que tal empresa pudo haber sido clasificada como una "utilidad pública" sujeta a reglamentación detallada por el estado. No obstante, se insiste inexorablemente en que si el propio municipio conduce tal empresa, la misma es "privada". La quiebra intelectual de tal razonamiento es evidente.

tura, emprende esta actividad, al así hacerlo emprende una actividad legítima como cuerpo gubernativo. Resolver lo contrario en un caso de esta índole sería otorgarle a los municipios de Puerto Rico el gobierno propio. El Congreso ha creído conveniente no otorgárselo. No estamos en libertad de hacerlo aparecer en el Acta Orgánica.

Otro aspecto de este problema merece atención. La corte de distrito asumió la posición de que el funcionamiento de un acueducto se lleva a cabo por un municipio en su capacidad de propiedad, "excepto en aquellos casos en que la Legislatura haya impuesto al Municipio la obligación de operar un sistema de acueducto". Pero ésta también es una fórmula que no tiene relación alguna al problema práctico aquí envuelto. Basar una sentencia tan portentosa y de tan gran alcance como la envuelta en el presente caso en la circunstancia puramente fortuita de que el estado autoriza [13] más bien que ordena a un municipio a poseer y operar su acueducto, por sí mismo demuestra que esta teoría se encuentra ya muy raída.

El municipio, una subdivisión, criatura y agente del estado, exige $7,000,000 por el traspaso de su acueducto, por el estado, a otra agencia de éste que continuará operándola con el mismo propósito. Y la única razón dada para ello es que el estatuto bajo el cual opera actualmente el acueducto es permisivo más bien que mandatorio. Es imposible seguir este argumento hasta una conclusión racional. El municipio es una subdivisión y agente del estado y existe a voluntad de éste. Un acueducto operado por el estado sería gubernativo. Un estatuto mandatorio disponiendo que el municipio opere el acueducto lo convertiría en una actividad gubernativa. Pero si por alguna razón el estatuto solamente "autoriza" que esta actividad legítima se realice en un campo vital a la salud pública, se convierte en "privada". Esto en verdad equivale a poner una definición encima de otra con

[13] Secciones 6 y 4, Ley número 99, Leyes de Puerto Rico, 1931 (pág. 627).

ningún propósito que podamos ver excepto el de obtener un resultado específico. El propio apelado demuestra la artificialidad de este razonamiento cuando argumenta que la Autoridad de Transporte está dedicada a una actividad gubernativa cuando opera una línea de guaguas, simplemente porque la legislatura ha ordenado, en vez de autorizado a la Autoridad, que se dedique a tal actividad. Designar la transportación como gubernativa, y el suministro de agua como privado equivale a hacer caso omiso de las realidades de la vida. Si existiera una imperiosa necesidad para tal ficción legal, concebiblemente podríamos ser persuadidos a aceptarla. Pero lo que se nos pide es que preservemos una ficción legal, utilizada en el derecho común y en nuestros casos para obtener un resultado justo y conveniente en otros campos del derecho, como una regla inflexible y automática en la ley de propiedad. No podemos dar tal paso, no importa lo que otras cortes hayan hecho.[14] El asunto se reduce a esto: El Municipio no tiene derecho a quejarse más que cualquiera otra agencia que funciona a través de toda la Isla—tales como la Autoridad de Comunicaciones o la propia Autoridad de Fuentes Fluviales—si sus funciones fueran transferidas a otra agencia. El que la política comprendida en la Ley ante nos sea razonable o sabia no cae

---

[14] Convenimos con el razonamiento de *Higginson* v. *Slattery*, 99 N.E. 523 (Mass., 1912), citado por el propio apelado. En él dice la corte (pág. 527): "A pesar de que el establecimiento de este parque era permisivo y no compulsorio, esta distinción no es decisiva. Es el carácter para el cual se usa que confiere a cualquier empresa municipal el carácter de pública o privada." La Corte Suprema de los Estados Unidos también ha rechazado esta teoría de la corte de distrito. En el caso de *Ger. Alliance Ins. Co.* v. *Home Water Co.*, 226 U.S. 220, a las págs. 227, 8, dicha Corte dijo: "Pero la ciudad no tenía obligación legal de suministrar agua; y si voluntariamente tuvo a bien hacer más de lo que exigía la ley, por ello no se expuso a una responsabilidad nueva o mayor. Actuó en una capacidad *gubernativa* y al fracasar en dicha empresa no era más responsable que lo que hubiera sido al no poder proporcionar una adecuada protección policíaca." (Bastardillas nuestras). Y aun asumiendo, como afirma el apelado, que el caso *Coyle* v. *Gray*, 30 A. 728 (Del., 1884), subsiste sólo al resolver que propiedad poseída por un municipio siempre se posee para fines públicos, estamos preparados para seguir dicho caso, por lo menos a los fines del problema específico ante nos.

dentro de nuestras atribuciones y no puede influir nuestra decisión de este caso. Y si el municipio debe ser compensado bajo tales circunstancias es una cuestión a determinarse por la legislatura, y no por esta Corte.

Notamos finalmente que los casos de *Brush* v. *Commissioner,* 300 U.S. 352, citado por los apelantes, y *Helvering* v. *Gerhardt,* 304 U. S. 405, citado por el apelado, son casos contributivos y por tanto no se aplican directamente a este caso. El caso de *Brush* decide que un funcionario del acueducto de la ciudad de Nueva York, se dedicaba a una función gubernativa esencial dentro del significado de los reglamentos de Tesorería Federal eximiendo de la contribución federal sobre ingresos la compensación recibida por funcionarios y empleados estatales por servicios prestados en conexión con una función gubernativa esencial del estado. Aquí también vemos el procedimiento familiar de usar la caracterización que producirá el resultado que, bajo todas las circunstancias, la corte cree servirá mejor los fines de la justicia. En síntesis, el acueducto de Nueva York es gubernativo a los fines de determinar la responsabilidad de sus empleados por contribución Federal sobre ingresos;[15] y privada o de propiedad en la ley de daños y perjuicios, con el

---

[15] A pesar del hecho de que el caso de *Brush* no es de completa aplicación al presente, el lenguaje del Juez Asociado Sr. Sutherland allí empleado gráficamente demuestra por qué en el caso de *Brush,* lo mismo que en el presente, había una ineludible necesidad de clasificar como gubernativa la explotación de un acueducto. Creemos conveniente, al concluir nuestra discusión sobre este aspecto del presente caso, citar dicho lenguaje *in extenso* encontrado a las págs. 362–3, 364, 365, 366, 368, 370–1:

''Probablemente no hay cuestión de derecho sobre la cual las decisiones de las cortes estatales estén en mayor conflicto y confusión que aquella que trata de la distinción entre los poderes gubernativos y corporativos de los municipios. Este estado de conflicto y confusión se refiere principalmente a las decisiones sobre responsabilidad en casos de daños y perjuicios debido a la negligencia de funcionarios y agentes del municipio. Sobre esta materia, no puede obtenerse una regla definitiva de dichas decisiones. Es cierto que en muchas de las cortes estatales, incluyendo las del estado de Nueva York, se ha resuelto que la explotación de acueductos cae dentro de la categoría de actividades corporativas; y se sostiene la responsabilidad de la ciudad en acciones de daños y perjuicios provenientes de la negligencia en tal explotación. Pero la regla con respecto a tales casos, como se dijo en el de *Trenton* v. *New Jersey,* 262 U.S. 182, 192, se 'aplica para evitar

fin de evitar la inmunidad de responsabilidad proveniente de las operaciones gubernamentales. Pero, como hemos visto, el uso de cualquiera de estas clasificaciones es irrelevante cuando se nos confronta con la alegación del municipio de que el traspaso por el estado de su acueducto a otra agencia gubernativa sin compensación, lo despojaría de su propiedad en violación de sus derechos constitucionales.

Todo lo que tenemos que decir en el presente caso por tanto es que la posesión y operación de su acueducto por el Gobierno de la Capital es una actividad propia de una agencia gubernativa. Esta manifestación, lo hacemos constar claramente, no cierra las puertas a una decisión en el futuro en un caso que no envuelva una cuestión constitucional, de que a los fines de la ley de propiedad un municipio posee un acueducto bien (a) en su capacidad privada, o (b) en su capacidad gubernativa. Nuestra decisión equivale sólo a la negativa a permitir el uso de una ficción, legal inadecuada a los hechos del caso con el fin de dictar la decisión en éste.

Reconocemos que en efecto práctico ésta es una resolución de que, a los fines del presente caso, la Capital posee y opera su acueducto en su capacidad pública o gubernativa.

dificultades, con el fin de que no provengan injusticias del reconocimiento de defensas técnicas basadas en el carácter gubernativo de tales corporaciones'; y la regla es indefinida sin remedio alguno, probablemente por dicha razón.

"Sin embargo, ésta no es una acción por daños personales, sino un procedimiento que en efecto intenta se determine si la inmunidad contra contribuciones federales, con respecto a la actividad en cuestión, se aplica a favor de un municipio creado por el estado—un objetivo tan diferente en su carácter a aquel que se pretende obtener en una acción de daños y perjuicios, que sugiere se tenga cuidado al aplicar como la guía para la decisión del primero, una regla local de derecho adoptada judicialmente con el fin de evitar supuestas injusticias que de otro modo resultarían en el segundo. . . .

"La regla con respecto a la responsabilidad del municipio en daños y perjuicios, es una cuestión local; y toca únicamente al estado que dió vida al municipio, decidir si debe ser estricta o liberal, o negarse de plano (*Detroit* v. *Osborne,* 135 U.S. 492, 497–498) siempre y cuando, desde luego, que no se infrinja la Constitución Federal . . . .

"

"Por tanto creemos que sería prudente limitar, lo más estrictamente posible, la presente investigación a las necesidades de la cuestión aquí envuelta y no, tra-

Una vez que se esclarece el hecho de que la resolución se contrae a los hechos de este caso, la encontramos tan razonable como consistente con los casos de daños y perjuicios como el de *Colón* v. *Capital de Puerto Rico,* supra, y los casos contributivos como el de *Brush* y. *Commissioner,* supra.

tando de elaborar una fórmula general, correr el riesgo de dificultar la decisión de los casos con respecto a actividades municipales de diferente clase que puedan surgir en el futuro. . . .

''El interés público en cuanto a la conservación y distribución de agua para innumerables propósitos—que fluctúan desde los usos corrientes de agricultura, vivienda y sanidad, hasta la conservación de la salud y de la propia vida—es obvio y bien establecido. Para una ciudad moderna, la conservación y distribución de agua en cantidades suficientes y en un estado de pureza, son tan vitales como el aire. Y esta necesidad vital se torna cada día más y más aparente y necesaria a medida que las ciudades crecen en población y densidad de población. . . .

'' . . . . . . . .

''Aun cuando estos casos [los casos antiguos de la Corte Suprema] no lo deciden, claramente sugieren que los acueductos municipales creados y operados con el fin de suplir las necesidades de una ciudad y sus habitantes son obras públicas y su operación esencialmente de un carácter gubernativo. Sin embargo, otras decisiones de esta Corte sostienen más directamente tal conclusión.

'' . . . . . .

''Concluímos que la adquisición y distribución de una cantidad de agua para llenar las necesidades de una ciudad moderna envuelven el ejercicio de funciones gubernativas esenciales, y esta conclusión se robustece mediante la consideración de los usos públicos a que se destina el agua. Sin tal suministro no podrían existir las escuelas públicas, los alcantarillados tan necesarios para conservar la salud, los parques de bomberos, el riego y limpieza de las calles, los edificios públicos, los parques, campos de juego y baños públicos. Y esto equivale en el verdadero sentido de la palabra a decir que la misma ciudad desaparecería entonces. . . . Puede ser, como se sugiere, que las corporaciones privadas estén dispuestas a asumir el suministro de agua para todos los fines; pero si el Estado y la Ciudad de Nueva York son de opinión, como evidentemente lo son, que no se debe confiar el servicio a manos privadas sino que debe rendirse por la propia ciudad como un medio apropiado de cumplir su deber para proteger la salud, seguridad y vidas de sus habitantes, no tenemos dudas de que así puede hacerlo en el ejercicio de sus funciones gubernativas esenciales.

''Nada encontramos que debilite esta conclusión en el hecho de que en épocas pasadas la empresa de suministrar agua a las ciudades urbanas, incluyendo Nueva York, se dejaba en gran parte, o aun totalmente en manos privadas. Por muchos años la tendencia ha sido hacer lo contrario, hasta ahora en que las autoridades municipales se han hecho cargo de tal empresa en casi todas las grandes ciudades. No puede decirse que las funciones gubernativas no existen porque se les deje pendientes o porque yacen dormidas durante algún tiempo. Si por su naturaleza son gubernativas, no dejan de serlo porque recientemente se haya comenzado a usarlas.''

## II

■ No existe controversia entre las partes en cuanto a la proposición de que toca a esta corte decidir, como cuestión de ley local, que cualquier función específica de un municipio es gubernativa o de propiedad. Al llegar a las conclusiones que preceden así lo hemos tratado. Pero ése no es el único problema envuelto en este caso. Todavía nos queda la cuestión de constitucionalidad.

Casi todos los casos estatales, fundamentados bien en la cuestión de ley local o en la de constitucionalidad, fueron decididos con anterioridad al caso de *Trenton* v. *New Jersey,* 262 U. S. 182. Dicho caso ha tenido un profundo efecto sobre el problema ante nos, y por tanto merece un minucioso examen.

En el caso de *Trenton* el estado de New Jersey había concedido a una corporación el derecho de tomar agua del río Delaware para suministrarla a los residentes de Trenton. Luego, la ciudad de Trenton, de conformidad con la autoridad otorgádale por el estado, compró la propiedad, franquicias y privilegios de la corporación. Posteriormente la legislatura aprobó una ley imponiendo a los municipios el pago de una licencia por el derecho a tomar agua de los ríos, con fines de suministro público, en exceso de cierta cantidad. El caso llegó a la Corte Suprema de los Estados Unidos procedente de la Corte Suprema Estatal que había confirmado una sentencia a favor del estado y en contra de la ciudad de Trenton por los derechos de licencia adeudados. La Corte Suprema expuso la controversia como sigue (pág. 183):

"El derecho del Estado a cobrar depende de la validez de una ley de la legislatura (c. 252, Leyes de 1907). Afirma la Ciudad que esta ley está en pugna con la cláusula sobre contratos de la Constitución de los Estados Unidos, y que *toma propiedad poseída por la Ciudad en su capacidad privada o de propiedad* para fines públicos sin una compensación justa y sin el debido procedimiento de ley en violación de la Enmienda Décimocuarta." (Bastardillas nuestras)..

Después de exponer los hechos y discutir varios casos anteriores, la corte, por voz de su Juez Asociado Sr. Butler, dice a la pág. 188:

"El poder del Estado no restringido por la cláusula sobre contratos o la Enmienda Décimocuarta, sobre los derechos y la propiedad de ciudades, poseídos y usados para 'propósitos gubernativos', no puede cuestionarse. En el caso de *Hunter* v. *Pittsburgh*, supra, 179 se hace referencia a la distinción entre propiedad poseída por corporaciones municipales en su capacidad pública y gubernativa y aquella poseída en su capacidad privada o de propiedad, y se hizo referencia a decisiones de esta Corte que mencionaban tal distinción. En ninguno de estos casos aparece poder, derecho o propiedad alguno de una ciudad o cualquiera otra subdivisión política, protegido por la cláusula sobre contratos o la Enmienda Décimocuarta. *Esta Corte nunca ha resuelto que estas subdivisiones puedan invocar tales restricciones sobre el poder del Estado.*" (Bastardillas nuestras).

En vista de nuestra conclusión arriba indicada de que como cuestión de ley local la distinción entre propiedad poseída por un municipio en su capacidad pública y aquella poseída en su capacidad de propiedad no tiene propósito práctico y es de dudosa validez en cuanto a la cuestión de ley de propiedad aquí envuelta, y en vista del hecho de que todas las cortes han resuelto, según indica el Juez Asociado Sr. Butler, y admitido por la Capital, de que "el poder del Estado . . . . sobre los derechos y propiedades poseídas y usadas para 'fines *gubernativos'* no puede cuestionarse," nuestra discusión del caso de *Trenton* podría muy bien finalizar aquí. Ninguna ciudad, como dice el caso de *Trenton,* ha persuadido alguna vez a la Corte Suprema de que tenía derecho a invocar las disposiciones constitucionales envueltas contra el Estado. No podemos ver la razón por la cual debamos llegar a un resultado contrario.

Pero el caso de *Trenton* va más lejos. Resuelve que aun en aquellos casos en que las cortes estatales concluyen que es su deseo como cuestión de ley local el caracterizar tal propiedad como poseída por un municipio en su capacidad

454

privada o de propiedad, la Constitución Federal no le impide al Estado el tomar tal propiedad o interés alguno sobre la misma sin compensación. El lenguaje de la Corte Suprema merece ser citado completamente en cuanto a este punto. La corte dice a las págs. 191, 2:

"La distinción entre el municipio como agente del Estado para fines gubernativos y como organización para hacerse cargo de necesidades locales en una capacidad privada o de propiedad, ha sido aplicada a varias ramas de la ley de corporaciones municipales. Los ejemplos más numerosos se encuentran en casos que envuelven la cuestión de responsabilidad por actos u omisiones negligentes de sus funcionarios o agentes. Véanse *Harris* v. *District of Columbia,* 256 U.S. 650, y casos citados. Se ha resuelto que los municipios no son responsables por tales actos y omisiones en el ejercicio del poder de policía, o en el desempeño de aquellas facultades municipales como la construcción y conservación de la alcaldía y del edificio de la corte, la protección de los habitantes de la ciudad contra las enfermedades y condiciones antihigiénicas, el cuidado de los enfermos, el funcionamiento de parques de bomberos, la inspección de calderas, el fomento de la educación y el ejercicio de la caridad pública. Por otro lado se les ha hecho responsables cuando tales actos u omisiones ocurren en el ejercicio del poder para construir y conservar puentes calles y carreteras y acueductos, construir alcantarillados, recoger la basura y vigilar el basurero. Se deniega la compensación cuando la actuación o la omisión ocurre en el ejercicio de aquello que se tiene por poderes gubernativos, y se permite si ocurre en una capacidad de propiedad. La base de la distinción es difícil de exponer, y no hay establecida regla alguna para la determinación de lo que pertenece a una clase o a otra. Se originó con las cortes. Generalmente se aplica para evitar dificultades, con el fin de que no provengan injusticias del reconocimiento de defensas técnicas basadas en el carácter gubernativo de tales corporaciones. *Pero tal distinción no proporciona base alguna para la aplicación de limitaciones constitucionales que se tratan de invocar aquí por la ciudad de Trenton contra el Estado de New Jersey. Dichas limitaciones no se aplican en contra de los Estados y a favor de sus propios municipios. Resolvemos que la ciudad no puede invocar estas disposiciones de la Constitución Federal en contra de la imposición de una licencia o derecho por la toma de agua expresada en la ley estatal aquí envuelta. Con vista de anteriores opiniones de esta Corte, no se presenta ninguna cuestión federal substancial."* (Bastardillas nuestras).

El apelado trata de limitar el alcance de la decisión en el caso de *Trenton*. Afirma que "en el caso de Trenton se resolvió que el estado tenía poder para controlar y preservar el uso de sus fuentes de agua para beneficio de sus habitantes y que el estado podía conceder o retener el privilegio como le viniera en gana". La corte de distrito estuvo conforme con el apelado. Al discutir en su opinión el caso de *Trenton,* la corte de distrito expresó que la Corte Suprema "resolvió . . . que el Estado tiene poder y es su deber controlar y conservar el uso de sus fuentes de agua para beneficio de todos sus habitantes", que la única manera en que la ciudad podía obtener agua era comprándosela al Estado, y "que es una función legislativa el poder determinar las condiciones bajo las cuales se pueden distraer las aguas de los ríos y lagos del Estado". Aparentemente el apelado y la corte de distrito pretenderían que tratáramos dichas manifestaciones como la resolución de la corte y las porciones restantes de la opinión arriba citadas como *dicta*.

No podemos adoptar tal punto de vista del caso de *Trenton*. Por el contrario, lo que el apelado dice que es la decisión, consiste de una serie de manifestaciones preliminares en cuanto a cuestiones obvias ya establecidas de ley local. La única cuestión ante la Corte Suprema para su *resolución,* como ya hemos visto del lenguaje de la propia Corte Suprema, era la cuestión constitucional Federal. Y sobre ella la corte resolvió que los salvaguardas de la Constitución Federal no pueden invocarse por un municipio para impedir que un estado tome propiedad municipal sin compensación, prescindiendo de si tal propiedad es caracterizada como cuestión de ley local poseída por el municipio en su capacidad gubernativa o en su capacidad de propiedad.

En verdad, en cierta parte de su alegato el apelado reconoce que algún efecto debe dársele al arrollador lenguaje arriba citado del caso de *Trenton*. Su alegato dice que "En

términos generales, se resuelve en el caso de Trenton, que el estado tiene *poderes* sobre los derechos y propiedad de las ciudades y municipios que no están limitados por las cláusulas de la *Constitución Federal* relativas al '*contract clause*' o al '*due process clause*'. Termina la opinión declarando que no había un '*federal question*' envuelto''. (Bastardillas del apelado). El apelado, desde luego, está correcto al decir que, en análisis final, la Corte Suprema concluyó que en el caso de *Trenton* no estaba envuelta cuestión Federal substancial alguna. Pero para así resolverlo, la corte tuvo primero que decidir que no se podía invocar disposición constitucional Federal alguna por un municipio bajo tales circunstancias contra un Estado. Y no hay la más leve intimación de la Corte Suprema de que su resolución esté limitada a los ''poderes'' otorgados a los Estados para controlar sus fuentes fluviales. Al contrario, el lenguaje es tan amplio como cualquier otro que pudo escribirse. Asumimos que el lenguaje de la Corte Suprema (pág. 192) de que ''Ellas ¡[la cláusula sobre contratos y la Enmienda Décimocuarta] no se aplican contra el Estado a favor de sus propios municipios'', significa exactamente lo que dice. Y ciertamente la Corte Suprema así ha entendido su propia decisión y lenguaje en casos posteriores,[16] como lo han hecho otras cortes [17] y autoridades secundarias.[18]

---

(16) ''La ciudad no puede invocar contra el Estado la protección de la Enmienda Décimocuarta.'' (citando *Trenton* v. *New Jersey*) *Newark* v. *New Jersey*, 262 U.S. 192, 196 (1923).

''El control del Estado y sus agencias sobre las corporaciones municipales dentro de su territorio no está limitado por las ·disposiciones de la Enmienda Décimocuarta.'' (citando *Trenton* v. *New Jersey*) *Risty* v. *Chicago, R. I. & Pac. Ry. Co.*, 270 U.S. 378, 390 (1926).

''Una corporación municipal, creada por un Estado para el mejor funcionamiento del gobierno, no tiene privilegios o inmunidades bajo la constitución federal que pueda invocar en contra de la voluntad de su creador.'' (citando *Trenton* v. *New Jersey*) *Williams* v. *Mayor*, 289 U.S. 36, 40 (1933).

''Las corporaciones municipales, siendo criaturas del estado, carecen de base para invocar la cláusula sobre contratos o las disposiciones de la Enmienda Déci-

El esfuerzo para distinguir el caso de *Trenton* por varios otros fundamentos es insostenible. Por ejemplo, afirma el apelado que la ley allí envuelta no pretendía privar al municipio de su propiedad. Pero sí disponía que la ciudad tendría que pagar otra vez por lo que anteriormente había comprado a un dueño privado, que es substancialmente la misma cosa. Y ciertamente la Corte Suprema consideró la ley como una que le quitaba la propiedad a la ciudad.

De más está decir que el Estado puede ser restringido de traspasar propiedad municipal a personas privadas. (Véanse *New Orleans, M. & C. R. Co.* v. *City of New Orleans*, 26 La. Ann. 478 (1874); *Ellerman* v. *McMains*, 30 La. Ann. 190, 31 Am. Rep. 218 (1878)). Pero escasamente tenemos que añadir que la Ley núm. 39 no contempla tal traspaso.

De paso también notamos que dos de los casos citados por la corte de distrito (*St. Louis* v. *Western Union Telegraph Co.*, 148 U. S. 92 (1893) y *Tom of Nahant* v. *United States*, 136 F. 273 (C.C.A. 1st, 1905)) presentan una cuestión constitucional diferente, toda vez que tratan de la adquisición de propiedad municipal por el Gobierno Federal, que es una soberanía separada y que no es el creador o principal del municipio envuelto. De la misma manera, el caso de *El Pueblo* v. *Municipio de San Juan*, 19 D.P.R. 656,

---

mocuarta de la Constitución contra la voluntad de su creador.'' (citando *Trenton* v. *New Jersey*) *Coleman* v. *Miller*, 307 U.S. 433, 441 (1939).

([17])*Cranford Co.* v. *City of New York* (C.C.A. 2d, 1930), 38 F. (2d) 52, cert. denegado 281 U.S. 760; *Franklin Tp. in Somerset County, N. J.* v. *Tugwell*, 85 F. (2d) 208, 13 (C.C.A. D.C., 1936); *City of Tulsa* v. *Oklahoma Natural Gas Co.*, (Dist. Ct., Okla., 1925) 4 F. (2d) 399, apelación desestimada 269 U.S. 527; *Henderson* v. *Twin Falls County*, 80 P. (2d) 801 (Idaho, 1938); *Jersey City* v. *Martin*, 19 A. (2d) 40 (N.J., 1941); *State ex rel. Martin* v. *City of Juneau*, 300 N.W. 187 (Wis., 1941); *State* v. *Marin Municipal Water Dist.*, 111 P. (2d) 651 (Calif., 1941).

([18])Doddridge, Distinction Between Governmental and Proprietary Functions of Municipal Corporations, 23 Mich. L. Rev. 325, 332, 33; Schulz, The Effect of the Contract Clause and the Fourteenth Amendment Upon the Power of the States to Control Municipal Corporations, 36 Mich. L. Rev. 385; Robertson & Kirkham, Jurisdiction of the Supreme Court of the United States, págs. 502, 3; 37 Harv. L. Rev. 159, 60; 116 A.L.R. a las págs. 1038, 9.

no es de aplicación aquí. Dicho caso sólo existe en cuanto a la proposición de que, en ausencia de legislación específica a ese efecto, el gobierno insular no puede privar a un municipio de su propiedad. Pero la Ley núm. 39 es exactamente tal legislación. Cierto es que el Código Civil y la Ley de expropiación forzosa[19] anteriormente disponían que un municipio debería ser compensado por su propiedad cuando se la quita el Pueblo de Puerto Rico. Pero la Ley de Acueductos posterior es "por sí sola una ley completa que constituye una actuación legislativa sobre toda la materia de que trata, y puede por tanto enmendar o derogar por implicación las disposiciones de leyes anteriores". (*Vidal* v. *Fernández*, 104 F. (2) 606, 608 (C.C.A. 1ro. 1939)). La Ley de Acueductos expresamente dispone que en el caso de acueductos municipales, la compensación será en la forma limitada allí provista. En su consecuencia, la legislación general relativa a la compensación de los municipios por su propiedad cuando se la quita el Pueblo de Puerto Rico obviamente se ha revocado *pro tanto,* como así lo dispone la sección 18.[20]

Resta sólo añadir que la distinción que se encuentra en el artículo 256[21] del Código Civil entre las dos clases de propiedad poseídas por los municipios—"bienes de uso público" frente a "bienes patrimoniales"—no conlleva necesariamente las mismas consecuencias legales que se han desarrollado en el derecho común como cuestión de legislación

---

[19] Artículos 256 y 282, Código Civil; Ley de Expropiación Forzosa, Estatutos Revisados y Códigos de Puerto Rico, etc., de 1941, (1) pág. 821.

[20] La sección 18 de la Ley de Acueductos dice como sigue:

"Toda ley o parte de ley que se oponga a la presente queda por ésta derogada."

[21] El artículo 256 del Código Civil dice como sigue:

"Son bienes de uso público en Puerto Rico y en sus pueblos los caminos insulares y los vecinales, las plazas, calles, fuentes y aguas públicas, los paseos y las obras públicas de servicio general, costeadas por los mismos pueblos o con fondos del tesoro de Puerto Rico.

"Todos los demás bienes que El Pueblo de Puerto Rico o los municipios posean, son patrimoniales y se regirán por las disposiciones de este código."

judicial al distinguir entre propiedad poseída por un municipio en su capacidad gubernativa frente a su capacidad de propiedad. La distinción del derecho civil simplemente indica la diferencia entre bienes de uso público para ser usados libremente por el público en general, tales como las plazas, calles y parques, frente a bienes patrimoniales, que se usan para fines públicos pero a los cuales el público no tiene constante y general acceso. Pero nada encontramos en dicho concepto que nos ordene decidir que bienes patrimoniales de un municipio son "bienes privados" en los cuales el municipio tiene adquirido para siempre tal interés de propiedad, del cual la Legislatura por medio de una ley posterior deliberadamente diseñada para cumplir dicho propósito no pueda privarlo sin razonable compensación. Y de necesitarse algo más, de cualquier modo el argumento contrario se desplomó cuando los municipios, no importa el *status* que tuvieran bajo el régimen español, pasaron a ser bajo el Acta Orgánica meras subdivisiones del gobierno insular, con todas las consecuencias que hemos visto provienen de dicho *status*.

Tampoco la cuestión constitucional aquí envuelta es afectada por el caso de *Vilas* v. *Manila,* 220 U. S. 345, citado por la corte de distrito en cuanto a la proposición de que la Corte Suprema reconoció la distinción entre funciones gubernativas y de propiedad. La corte de distrito indudablemente estuvo correcta en dicha manifestación. Pero debe notarse que la distinción se usó para hacer efectivas las reclamaciones de los acreedores de la vieja ciudad de Manila en contra de la nueva ciudad de Manila establecida después de la cesión de las Filipinas a los Estados Unidos. Esto sólo demuestra que la distinción todavía es útil en otros campos que no sean los de la ley constitucional o de propiedad. Pero el hecho de que haya probado en el pasado ser una ficción legal efectiva en la ley de daños o de contratos,

no nos obliga inexorablemente, como ya se ha indicado, a aplicarla aquí.

No es necesario en este caso que expresemos nuestros puntos de vista en cuanto a la contención de los apelantes de que las cláusulas del debido procedimiento, de contratos y de justa compensación de nuestra Carta Orgánica no son leyes locales; que los casos surgidos en relación con la misma no envuelven cuestiones locales sobre las cuales, de acuerdo con decisiones familiares de la Corte Suprema, prevalecen nuestras conclusiones a menos que sean inescapablemente erróneas; y que por tanto estamos obligados por el caso de *Trenton* en cuanto a la cuestión bajo consideración. El Congreso ha puesto a esta Corte en posición subordinada a la Corte de Circuito de Apelaciones y a la Corte Suprema de los Estados Unidos. Es, por tanto, difícil concebir una situación en la que pretendamos diferir de la Corte Suprema en la interpretación y aplicación de aquellas disposiciones fundamentales de nuestra Carta Orgánica que han sido substancialmente copiadas de la Constitución Federal. (*Cf. General Motors Aceptance Corporation* v. *Brañuela,* 61 D.P.R. 725, 730).

De cualquier manera, el problema no surge en este caso, en vista de que estamos enteramente conformes con la resolución y el lenguaje del caso de *Trenton* en cuanto a que dichas cláusulas constitucionales no pueden ser invocadas por un municipio en contra del Estado. Y asumiendo, como afirman los apelados y aceptan los apelantes, que, aparte de la cuestión constitucional envuelta, la decisión en cuanto a que el caracterizar una actividad municipal como gubernativa o de propiedad, envuelve una cuestión de ley local, hemos resuelto, como ya se ha indicado, dicha cuestión en contra del municipio a los fines de este caso específico. Por tanto, estamos constreñidos a soslayar las cuestiones fascinantes que todavía no se han explorado con respecto a la doctrina de inescapablemente errónea (Véase *De Castro* v.

*Board of Com'rs of San Juan,* 136 F. (2d) 419 (C.C.A. 1st, 1943); auto de *certiorari* expedido en 28 de febrero de 1944).

### III

 El apelado también trata de que resolvamos que la Ley núm. 39 es inválida, toda vez que se alega no se ajusta al Artículo 34, párrafo 8, de nuestra Carta Orgánica, al efecto de que "no se aprobará ningún proyecto de ley . . . que contenga más de un asunto, el cual deberá ser claramente expresado en su título . . .". (Título 48 U.S.C.A. sec. 832).

El argumento del apelado es que el título de la Ley núm. 39 es capcioso (*misleading*) cuando provee en parte "Ley para . . . disponer lo necesario par valorar las propiedades municipales que se traspasen a la Autoridad de Fuentes Fluviales y compensar a los municipios el valor de las mismas", toda vez que el texto de la ley no provee una compensación justa. Los apelantes afirman que el título es válido porque la ley sí provee para alguna forma de compensación; y que, de cualquier modo, como la Sección 832 del Título 48 U.S. C.A. también provee que "si algún asunto que no esté expresado en el título fuere incluído en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en el título", simplemente debemos declarar inválidas las secciones de la Ley núm. 39 disponiendo una compensación limitada y declarar válida la Ley en total como que autoriza el traspaso de acueductos municipales sin compensación para ello (Crawford *on Statutory Construction*, Sección 146, págs. 221-2).[22]

---

(22) Dicha sección lee como sigue:

"Como hemos indicado en otra parte de esta opinión, aquellas disposiciones de un estatuto que no estén propiamente expresadas en su título, serán nulas en muchos casos. Cuando esto ocurre, surge desde luego la cuestión en cuanto al efecto de tal nulidad sobre aquellas disposiciones que se expresan adecuadamente en el título. Los mismos principios generales son tan aplicables aquí como en aquellos casos en que la nulidad parcial surge de otros defectos. Así, si todas las disposiciones de una ley están de tal modo relacionadas e inseparablemente conec-

Durante los últimos años ha habido la tendencia por parte de nuestra Legislatura de utilizar títulos para sus leyes los cuales, según dicen los apelados, son "expuestos tan detalladamente que casi los coloca por sí mismos en una *categoría* separada". Estos títulos frecuentemente son casi tan extensos como las propias leyes, y pretenden describir y aún sintetizar el contenido de cada sección de las leyes envueltas. Indudablemente tales títulos meticulosamente detallados persiguen el laudable propósito de cumplir con el Artículo 34, párrafo 8, del Acta Orgánica. Pero nunca fué la intención del Congreso el que un legislador no tuviera necesidad de ir más allá del título de una ley para determinar su contenido. Un título no es el substituto de una ley; sólo sirve como el poste indicador que nos conduce a la propia ley, donde se espera que uno encuentre sus disposiciones en detalle. Una vez que el "asunto" de una ley ha sido "expresado claramente en su título" la función que desempeña el título desaparece. Las legislaturas antiguas comprendieron esto. Nuestros tomos están repletos de leyes extensas y complicadas, cuyos títulos son sencillos y precisos, compuestos de tres o cuatro líneas. Estas leyes o nunca se han atacado ante las cortes, o han sido sostenidas por tratar de un asunto que claramente se expresa en el título. (Véase *Rivera* v. *Corte,* 62 D.P.R. 513, 539, 40).

Pero—y aquí llegamos a la médula de la cuestión—cuando la legislatura, por razones íntimas no exigidas estrictamente por las disposiciones del Acta Orgánica, elige sintetizar en su título el contenido de una ley más bien que expresar sencillamente el asunto, corre el riesgo de que tal síntesis sea

tadas que la eliminación de la porción que es nula dejare la ley incompleta, ininteligible o incapaz de ponerse en vigor, todo el estatuto será nulo. Por el contrario, si las disposiciones válidas son en sí mismas independientes y completas, razonables y susceptibles de ser puestas en vigor, las mismas serán efectivas. Sin embargo, si del estatuto se desprende que la asamblea legislativa promulgó las disposiciones válidas por razón de las disposiciones nulas, toda la ley es nula. Y lo mismo es cierto cuando surge el hecho de que la legislatura no hubiera aprobado la ley si se hubiera omitido alguna de sus disposiciones."

tan imperfecta que resulte sustancialmente capciosa en cuanto a porciones materiales de la ley. Esta es exactamente la situación con que nos confrontamos en este caso. Si el título de la Ley número 39—que se copia al margen como ejemplo de la innecesaria proligidad en el título de una ley [23] —hubiera sencillamente dejado de mencionar la cuestión de la compensación, concebiblemente quizás hubiéramos resuelto, de conformidad con *Rivera* v. *Corte,* supra, que el asunto de la ley no obstante había sido expuesto en el título y el de-

[23] "LEY para proteger la salud de los habitantes de Puerto Rico mediante el uniforme y eficiente funcionamiento de los distintos sistemas de acueducto; cooperar con los municipios de Puerto Rico en el mejoramiento de este servicio bajo un plan de adecuada coordinación que garantice a todos los pueblos una amplia provisión de agua potable; facultar a la Autoridad de las Fuentes Fluviales de Puerto Rico a establecer, hacer funcionar y administrar los sistemas de aprovisionamiento y suministro de aguas potables que resultaren necesarias para uso de los habitantes de las zonas urbanas y rurales de Puerto Rico; encomendar al Comisionado de Sanidad de Puerto Rico la inspección de todos los sistemas públicos de aprovisionamiento y suministro de aguas potables y fijar sus funciones y deberes en relación con dicha inspección; fijar el procedimiento para traspasar a la Autoridad de las Fuentes Fluviales de Puerto Rico la administración y el funcionamiento de cualquier sistema de acueducto que constituya una amenaza para la salud pública; coordinar el funcionamiento de los distintos servicios de acueductos bajo la jurisdicción de la Autoridad de las Fuentes Fluviales de Puerto Rico; traspasar a dicha Autoridad para el mejor logro de esta coordinación las propiedades que tengan relación con el abastecimiento de agua pertenecientes a los municipios de Puerto Rico, incluyendo a la Capital de Puerto Rico; conferir a la Autoridad de Fuentes Fluviales de Puerto Rico poderes para recibir, poseer y administrar tales propiedades; facultarla para llevar a cabo los actos necesarios para incorporar y organizar de acuerdo con la ley la corporación o corporaciones subsidiarias que estime aconsejables a los fines de poseer, conservar y administrar cualquiera o toda la propiedad que por la presente se le traspasa; autorizar al Gobernador de Puerto Rico a fijar la fecha en que deberán efectuarse los traspasos de propiedad que aquí se determinan; establecer normas para las tarifas a cobrarse por servicio de agua; *disponer lo necesario para valorar las propiedades municipales que se traspasen a la Autoridad de Fuentes Fluviales y compensar a los municipios el valor de las mismas; proveer los pagos anuales que la Autoridad de Fuentes Fluviales deberán hacer a los municipios cuyos acueductos sean traspasados de acuerdo con esta Ley;* facultar a la Autoridad de las Fuentes Fluviales para emitir bonos para el mejoramiento, la ampliación, la reparación y la construcción de sistemas de acueductos hasta la suma de cinco millones (5,000,000) de dólares, garantizados por las propiedades de dichos acueductos y/o con las rentas de los mismos; facultarla además para aceptar donaciones, subsidios, asignaciones y regalías de agencias o instrumentalidades de los gobiernos de Estados Unidos y Puerto Rico, y para otros fines." (Bastardillas nuestras).

jar de mencionar la compensación no era necesariamente fatal. Pero la Legislatura trató de describir en el título la compensación provista por la ley. Habiendo elegido exponer el título en detalle, la legislatura debe asegurarse que tal información detallada no es capciosa en la forma indicada.

Sin embargo en el caso específico ante ños nunca llegamos a la cuestión de si el título de la Ley número 39 es suficientemente capcioso para traer la nulidad de la ley bajo esta fórmula. No podemos proseguir en nuestro examen del mismo por la sencilla razón de que la Capital no tiene base (*standing*) para levantar este punto. Tal como lo expusimos, "la constitucionalidad de una ley no puede ser impugnada a menos que el que la ataca demuestre que dicha ley le priva de derechos protegidos por la Constitución". (*Colegio de Farmacéuticos* v. *Junta de Farmacia,* 60 D.P.R. 811, 816.)

El Acta Orgánica es nuestra Constitución. Una ley de nuestra Legislatura que esté en pugna con una de sus disposiciones es por tanto inconstitucional. Pero ya hemos visto que disposiciones constitucionales de considerablemente mayor jerarquía—las cláusulas de debido procedimiento, contratos, privilegios e inmunidad—no pueden invocarse por un municipio en contra de su creador, el Estado. El hecho cierto es que no puede encontrarse en toda el Acta Orgánica una clavija en la cual se pueda colgar el interés legal del municipio. Y debe existir interés legal, para las cortes poder otorgar protección. Asumimos sin decidirlo que el Municipio será perjudicado por esta ley. Pero el mero perjuicio no es suficiente—tal perjuicio podría solamente constituir *damnum absque injuria.* Debe demostrarse la invasión de los derechos legales de la persona. El lenguaje del Juez Asociado señor Roberts en *Tennessee Electric Power Co.* v. *T. V. A.,* 306 U. S. 118, es apto en cuanto a este particular. Dice a las págs. 137, 8:

"Los apelantes invocan la doctrina de que una persona amenazada de perjuicios directos y especiales debidos a la actuación de un agente del Gobierno que, a no ser mediante autoridad estatutaria para realizarla sería una violación de sus derechos legales, puede atacar la validez de un estatuto en un pleito contra el agente. El principio no tiene aplicación a menos que el derecho invadido sea uno legal—uno de propiedad, uno proveniente de un contrato, uno protegido contra invasión torticera, o uno basado en un estatuto que le confiere un privilegio . . ."

Escasamente podría sostenerse que las partes que atacaron las leyes en los casos de *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 125, *Porto Rico Ry., Light & Power Co.* v. *Colom,* 106 F. (2d) 345, 354 (C. C. A. 1st, 1939) no sufrirían perjuicio real de haber quedado vigente dichas leyes. Pero las cortes no obstante resolvieron que tal perjuicio no equivalía a la invasión de un derecho legal; por tanto se les negó a las partes acceso a las cortes en sus esfuerzos para anular las leyes allí envueltas.

Esta doctrina, como hemos visto, se aplica a los derechos de entidades privadas como en los casos de *Alabama Power Co.* y *Puerto Rico Railway, Light & Power Co.* Hay envuelta una considerablemente más importante política pública cuando se aplica la doctrina a pleitos entre el soberano y una de sus subdivisiones públicas. Como ya se ha indicado, aun las más fundamentales disposiciones constitucionales no pueden invocarse por un municipio en contra de su creador, el Estado. No podemos ver de qué manera el título de una ley que se alega es defectuoso "perjudica legalmente" a un municipio cuando la propia ley, aun cuando le quita la propiedad al Municipio sin el debido procedimiento de ley, no "perjudica legalmente" al municipio, como ya hemos resuelto. No basta el argumento de que la Legislatura podría tomar la acción aquí contemplada solamente mediante una ley válida y que una ley con un título defectuoso no es una ley válida. En verdad eso equivaldría a querer tapar el cielo

con la mano. El requisito en cuanto al interés legal de una parte no puede encontrarse en la propia ley, sea ella válida o no. Es solamente cuando el interés legal de la parte ya existe independientemente y fuera de la ley—en verdad antes de su aprobación—que la parte perjudicada tiene derecho a atacar la ley cuando se apruebe la misma, de ser aprobada, si adolece del defecto aquí alegado.

El impacto de este argumento tal como se aplica a este caso se torna más patente cuando recordamos que un municipio es una mera subdivisión del Gobierno Insular.[24] Equivaldría exactamente a si el Comisionado del Interior, por ejemplo, alegara que sería perjudicado legalmente por una ley de la Legislatura traspasando algunas de sus funciones al Comisionado de Agricultura y por tanto tendría base (*standing*) para radicar un pleito con el fin de anular dicha ley. Ni el Comisionado del Interior en dicho caso ni el municipio en éste tendrían acceso a las cortes para atacar tales leyes debido a sus alegados títulos defectuosos. Ellos, o cualquiera otra persona, pueden sólo atacar dichas leyes ante las cortes si aquéllas infligen directamente sobre ellos perjuicio personal. Debe haber "un perjuicio o amenaza sobre un

---

[24] En el caso de *Pueblo ex rel. Castro* v. *Padrón Rivera*, 60 D.P.R. 798, dijimos a la página 808: "Aún cuando la rama insular y la rama municipal parecen funcionar como entidades distintas y separadas, ambas son en realidad partes de una sola instrumentalidad gubernamental—el gobierno de Puerto Rico. . . . Las subdivisiones municipales o municipios de Puerto Rico son criaturas de la Legislatura de Puerto Rico, que es una de las tres ramas del Gobierno de Puerto Rico. Es la legislatura insular la que puede dar vida a nuevas municipalidades y la que tiene facultad para consolidar dos o más de las ya existentes para formar una sola. Las leyes por las cuales se rigen los municipios son aprobadas por los legisladores insulares, y son éstos los que crean los cargos municipales y fijan y aumentan los sueldos de los funcionarios. Las contribuciones sobre los inmuebles radicados dentro de los límites de las respectivas municipalidades son cobradas por funcionarios del Gobierno Insular e ingresadas en los respectivos tesoros municipales. Las emisiones de bonos municipales requieren para su validez y efectividad la aprobación previa del Gobierno Insular. Todo esto demuestra claramente que los gobiernos municipales, por las relaciones que existen entre ellos y el Gobierno Insular y por la supervisión que éste ejerce sobre aquéllos, son partes integrantes del Gobierno de Puerto Rico."

derecho específico suyo, tal como se distingue del interés del público en la administración de la ley." [25]

Inmediatamente nos imaginamos las condiciones caóticas que surgirían si esta corte por medio de pleitos sobre sentencias declaratorias se convirtiera en una división de disputas entre y dentro de agencias para emitir opiniones legales a agencias o funcionarios ejecutivos subordinados sobre si la legislación traspasando sus funciones a otras agencias o funcionarios subordinados era defectuosa. Nuestro sistema judicial no fué diseñado para tal fin. Si se usara así, prontamente se desplomaría. Aun si estuviéramos autorizados para invadir este campo de operaciones gubernativas, dicha actuación sería contraria a la tendencia de nuestra historia judicial establecida hace muchos años. (*Tyler v. Judges of Court of Registration*, 179 U. S., 405; Robertson and Kirkham, *supra*, Chapter 33, p. 467, et seq.). En resumen las cortes han resuelto sabiamente que tales disputas no constituyen controversias justiciables.

A la luz del caso de *Trenton v. New Jersey*, y los principios aquí enunciados, el resolver en este caso que el título de la Ley número 39 es defectuoso, equivaldría a crear nosotros una controversia justiciable donde no existe ninguna. El título de dicha ley puede ser legalmente defectuoso. Pero una subdivisión o agente del Estado creado por la Legislatura no tiene interés legal o base (*standing*) para enfilar dicha contención constitucional contra esta legislación.

## IV

La cuestión principal litigada por las partes y decidida por la corte de distrito fué la constitucionalidad de la ley en vista de que dejó de proveer una justa compensación. Dicha cuestión ha sido resuelta por nosotros en contra de La Capital. Y hemos resuelto que una vez decidida en con-

---

[25] *Perkins* v. *Lukens Steel Co.*, 310 U.S. 113, 125. Esto es particularmente cierto en un pleito de sentencia declaratoria. (*Colegio de Farmacéuticos* v. *Junta de Farmacia*, 60 D.P.R. 811.)

468

tra del apelado esta principal cuestión de constitucionalidad, no tenía base (*standing*) para atacar la ley debido a su alegada violación de la disposición constitucional referente a los títulos de las leyes. De la misma manera, no podemos considerar las contenciones del apelado de que la Ley número 39 está en conflicto con ciertas otras disposiciones del Acta Orgánica.[26]

Pero la posición de la Capital es marcadamente diferente en relación con las disposiciones de la Ley enmendada con referencia a partidas tales como pagos anuales, ganancias y reservas. Todas éstas son para el beneficio económico directo del municipio de que se trata. Por tanto es obvio que La Capital tiene base en corte (*standing*) cuando el significado de las mismas se trae a discusión.

En el presente caso, sin embargo, el ataque del apelado a estas partidas se dirigió principalmente a demostrar que ellas no constituían justa compensación en el sentido constitucional. Toda vez que esto fué admitido, la corte de distrito no pasó en detalle sobre el significado de estas disposiciones del estatuto. Estas secciones de la ley son difíciles de entender. Al requerírsele en la vista oral para que las explicara, el abogado de la Autoridad de Fuentes Fluviales manifestó que él igualmente tenía dificultad para entender las disposiciones en cuanto a compensación de la ley, y afirmó que era sumamente necesario enmendarla. Convenimos con el abogado que son complejas y confusas. Pero aunque el apelado tiene derecho a levantar estas cuestiones, estamos renuentes a pasar *in vacuo* sobre dichas cuestiones detalla-

---

(26) Algunas de estas contenciones son: la Ley núm. 39 menoscaba las obligaciones de la Capital sobre los contratos con terceras personas; el otorgamiento de ciertos poderes y deberes al Consejo Ejecutivo y al Comisionado de Sanidad viola el Acta Orgánica; la Ley núm. 39 crea un nuevo departamento ejecutivo, en violación del Acta Orgánica; dicha Ley viola la disposición de la Carta Orgánica confiriendo el poder para conceder franquicias a la Comisión de Servicio Público.

Aparentemente no se insistió fuertemente en estas contenciones en la corte de distrito, y ésta no expresó opinión alguna sobre las mismas.

das dentro de la armazón de este recurso de sentencia declaratoria. Necesitamos más luz sobre lo que significan dichas disposiciones y de qué manera operarán en casos específicos. Si permanecen en el estatuto sin enmendarse y si vienen ante nos en un procedimiento adecuado presentando un problema concreto, le daremos la consideración cuidadosa que merecen. Mientras tanto, enfatizamos que la única cuestión [27] que hemos decidido en los méritos en esta apelación es que la legislatura puede disponer constitucionalmente el traspaso del título y el funcionamiento de un acueducto poseído y operado por un municipio sin disponer compensación para el municipio por la propiedad envuelta, siempre y cuando se asegure el funcionamiento continuo del acueducto para beneficio de los habitantes de dicho municipio.

*Por las razones expuestas, la sentencia de la corte de distrito será revocada y se dictará nueva sentencia declarando que la Ley núm. 39, según ha sido enmendada, no es nula por no disponer una justa compensación en el caso de que se traspase el acueducto de La Capital a la Autoridad de Fuentes Fluviales bajo los términos de dicha ley.*

---

[27] Por ejemplo, los derechos de tenedores de bonos en circulación, si algunos, de municipios y de sus acreedores, no están ante nos y no los comentamos.